**FILED & ENTERED**

**JUL 03 2025**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY fisherl     DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>Jeffrey A. Harman,<br><br>       Debtor. | Case No.: 1:22-bk-10981-VK<br><br>Chapter 7<br><br>Adv. No.: 1:22-ap-01060-VK |
| Huan Zhang,<br><br>       Plaintiff,<br><br>   v.<br><br>Jeffrey A. Harman,<br><br>       Defendant. | **MEMORANDUM OF OPINION AFTER TRIAL**<br><br><u>Trial:</u><br>Date:    March 10-14, 2025<br>Time:   9:00 a.m.<br>Place:  Courtroom 302<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

1

**TABLE OF CONTENTS**

2  I.  BACKGROUND ................................................................................................ 1

3    A.  The Parties ................................................................................................ 1

4    B.  The Parties' Relationship Begins ............................................................ 2

5    C.  The Film Equipment Rental Venture ...................................................... 2

6      1.  The First Operating Agreement ...................................................... 4

7      2.  Harman Purchases Film Equipment ................................................ 6

8    D.  The RR Film Venture ................................................................................ 8

9      1.  Zhang Visits Los Angeles ................................................................ 10

10      2.  The Second Operating Agreement ................................................ 11

11      3.  The Motion Picture Contract .......................................................... 12

12    E.  Zhang Returns to Switzerland, Wires $210,364 for the RR Film Venture .................... 13

13    F.  Zhang Begins to Question the RR Film Venture .................................... 15

14    G.  The Parties' Relationship Breaks Down; Zhang Pulls Out of the RR Film Venture ........ 20

15    H.  Harman Purchases the RR Script ............................................................ 21

16    I.  Zhang Makes Demands; Harman Continues Production of RR ...................................... 22

17    J.  Zhang Files the State Court Action........................................................ 22

18    K.  RR Film Production Ceases .................................................................... 23

19    L.  The State Court Conducts Trial, Enters Judgment in Favor of Zhang ........................ 24

20    M.  The Bankruptcy Case and Adversary Proceeding ................................ 26

21  II.  DISCUSSION ................................................................................................ 27

22    A.  Responsibility for Film's Outcome........................................................ 27

23    B.  The Role of Astrology ............................................................................ 28

24    C.  Fraud in 11 U.S.C.§§ 523(a)(2), (a)(4), and (a)(6) .............................. 29

25    D.  11 U.S.C. § 523(a)(2)(A) ........................................................................ 30

26      1.  Statements Respecting a Debtor's Financial Condition .............. 30

27      2.  Required Elements Under §523(a)(2)(A) ...................................... 31

28        (a)  False Pretenses and False Representations ........................ 31

(b)    Knowledge of Falsity ........................................................................ 31

(c)    Intent to Deceive ............................................................................... 32

(d)    Justifiable Reliance ........................................................................... 32

(e)    Damages............................................................................................ 32

3.    Zhang's $250,000 Contribution to APC Was Not a Triable Issue .............................. 33

4.    The Film Equipment Rental Venture.......................................................... 34

5.    The RR Film Venture................................................................................ 35

6.    Zhang's Transfer of $210,364 ................................................................... 36

E.    11 U.S.C. § 523(a)(4)........................................................................................ 36

1.    Fraud or Defalcation ................................................................................ 38

2.    Embezzlement........................................................................................... 40

F.    11 U.S.C. § 523(a)(6)........................................................................................ 41

1.    Inducing Zhang to Invest in APC for the Film Equipment Rental Venture ................. 43

2.    Inducing Zhang to Sign the First Operating Agreement and Transfer the $250,000 Before She Could Consult with Her Financial and Legal Advisors ..................................... 45

3.    Inducing Zhang to Invest in the RR Film Venture Through the Creation of the Second Operating Agreement and the Signing of the Motion Picture Contract and Without Giving Her Time to Consult with Her Advisors and Lawyers ........................................................ 46

4.    Inducing Zhang to Transfer the $210,364 Before There Was an Agreement as to the Terms of the Second Operating Agreement and the Motion Picture Contract .................... 46

5.    Using All or Part of the $210,364 That Zhang Transferred to APC on June 9, 2017, Even After She Instructed Harman Not to Use the Money for Further Steps to Produce RR Until They Had an Agreement; Continuing to Use All or Part of the $210,364 After It WasClear That Zhang Had Withdrawn or Was Highly Likely to Withdraw from Financing the RR Film Venture ................................................................................... 47

6.    Paying Himself Without Zhang's Consent and/or at a Time Which Damaged APC ... 51

G.    Prejudgment Interest and Attorney's Fees ........................................................ 54

III.    CONCLUSION................................................................................................ 55

1

# TABLE OF AUTHORITIES

2

**Cases**

3

4

*Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013) ...................................... 39

5

*Cohen v. de la Cruz*, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998) ........................ 33

6

*Field v. Mans*, 516 U.S. 59, 75, 116 S.Ct. 437, 439, 441, 133 L.Ed.2d 351 (1995).............. 32, 33

7

*Grogan v. Garner*, 498 U.S. 279, 291 (1991).................................................................. 43

8

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016)........................................................ 29, 32

9

*In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994).......................................................... 56

10

*In re Apte*, 180 B.R. 223, 229 (B.A.P. 9th Cir. 1995),......................................................... 32

11

*In re Bammer*, 131 F.3d 788, 791 (9th Cir. 1997) ............................................................ 44

12

*In re Barrack*, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998)................................................. 31, 32

13

*In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996)............................................................. 32

14

*In re Howell*, 623 B.R. 565, 576 (Bankr. C.D. Cal. 2020) .................................................. 30

15

*In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001) .......................................................... 43

16

*In re Kirsh*, 973 F.2d 1454, 1455-56 (9th Cir. 1992)........................................................ 33

17

*In re Miller*, 310 B.R. 185, 198-99 (Bankr. C.D. Cal. 2004)............................................... 32

18

*In re Reingold*, 2013 WL 1136546, *3 n.4 (B.A.P. 9th Cir. Mar. 19, 2013).............................. 31

19

*In re Sabban*, 600 F.3d 1219, 1223-24 (9th Cir. 2010) ..................................................... 56

20

*In re Sicroff*, 401 F.3d 1101, 1105 (9th Cir. 2005) ........................................................... 42

21

*In re Su*, 290 F.3d 1140, 1145- 46 (9th Cir. 2002) .......................................................... 43

22

In re *Tallant*, 218 B.R. 58, 69 (B.A.P. 9th Cir. 1998).......................................................... 30

23

*In re Thiara*, 285 B.R. 420, 434 (B.A.P. 9th Cir. 2002) ..................................................... 43

24

*In re Wada*, 210 B.R. 572, 576 (BAP 9th Cir. 1997).......................................................... 42

25

*In re Weinberg*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) ..................................................... 31

26

*Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)........................ 43

27

*Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 720, 138 S. Ct. 1752, 1761, 201 L. Ed.

2d 102 (2018).......................................................................................................... 30

28

*Leff v. Gunther*, 33 Cal. 3d 508, 514 (1983) ................................................................... 37

*Ragsdale v. Haller*, 780 F.2d 794, 796-7 (1986). ........................................................................ 38

*Shannon v. Russell (In re Russell)*, 203 B.R. 303, 312 (Bankr. S.D. Cal. 1996)......................... 31

**Statutes**

11 U.S.C. § 523(a)(2)............................................................................................................ 29, 30

11 U.S.C. § 523(a)(4)................................................................................................................. 37

11 U.S.C. § 523(a)(6)................................................................................................................. 42

On March 10 through March 14, 2025, the Court conducted a trial in the above-captioned adversary proceeding, the Honorable Geraldine Mund, United States Bankruptcy Judge, presiding.  Anthony R. Bisconti of Bienert Katzman Littrell Williams LLP appeared on behalf of plaintiff Huan Zhang.  Stella Havkin of Havkin and Shrago appeared on behalf of defendant Jeffrey A. Harman.

The Court has jurisdiction over the adversary proceeding commenced by the filing of plaintiff's *Complaint* [doc. 1].  The matter in controversy is a core proceeding.  Venue is proper pursuant to 28 U.S.C. § 1409.

For the reasons set forth below, the Court will enter judgment in favor of plaintiff Huan Zhang under 11 U.S.C. § 523(a)(4) and § 523(a)(6).  The Court is also filing a chronology, which is incorporated herein by reference. This Memorandum of Opinion After Trial constitutes the Court's findings of fact and conclusions of law.

# I.    BACKGROUND

## A.    *The Parties*

Plaintiff Huan Zhang is of Chinese origin but lives and works in Switzerland and has done so for many years.  She has worked as an interpreter of Spanish and English, mostly in the import and export area.  She manages her own investments, stocks and bonds, and consults with other clients on their investments.  The only investment that she has ever made in the United States is the one that is at issue in this adversary proceeding.

Defendant Jeffrey Harman has an extensive background in various parts of the entertainment industry including music production, finance procurement for productions, and the hands-on portions of creating and filming the final product.  He also describes himself as a "spiritual consultant and paranormal researcher."  During the trial this portion of his profession has been referred to as an "astrologer." Harman is married to Camille Harman.[1] Together, they have a son named Aidan who was 15 years old in 2017.

---

[1] For ease of reference, the Court generally will refer to individuals by their last names. The Court will refer to certain individuals by their first name to avoid confusion with other individuals who share the same last name.

Conjunction, LLC ("Conjunction") is a company formed in 2014 by Harman and Camille for astrology consultations, the sale of gemstones, and also for film production and film equipment rentals.

### B.      The Parties' Relationship Begins

Zhang first met Harman by email in October 2014 when a friend of Zhang's referred her to him as an astrologer.  Zhang, who was divorced and raising her children, was looking for financial guidance on where to invest her money.  Zhang paid Harman for each session and then – at Harman's request – she paid him a $1,500 retainer which would give her priority access to Harman when she desired it.  Throughout their relationship, she periodically paid additional retainer money as well as fees for sessions and for gemstones, which were to provide a variety of good energy when used.

Apparently there was little interaction in 2015, but beginning in 2016, Zhang consulted Harman for astrological readings to help guide a series of decisions about purchasing a home, where to send her children to school, and various business matters.

During these few years, they shared a lot of personal information.  Zhang revealed much of her business dealings.  No later than August 2016, Harman told her about his experience in the film business and in film equipment rental and production and that he was currently engaged in some portion of the film making process.  The consultations continued.  For example, in January 2017, Zhang sought Harman's advice on the energy in her house.

### C.      The Film Equipment Rental Venture

Zhang testified to things that Harman told her that built up her confidence in him, including that she should be engaged in a creative project and that such a business venture would be financially successful.  Starting in early 2017, Harman began telling Zhang about "a rare opportunity to purchase vintage camera lenses from a famous film director at what he characterized as a very cheap price."  According to Zhang, Harman told her that they should

1  form a company to buy the equipment and that renting it out could easily generate $10,000 per

2  month.  He asked Zhang to invest $250,000 in this project.[2]

3      Harman disputed Zhang's testimony when he testified.  According to him, the purpose

4  was to buy and hold the equipment as it appreciated in value.  While he might be able to rent it

5  out, he really wasn't interested in that because he knew that it was not a good way to make

6  money.  Conjunction rented equipment as part of its operations and it was not very lucrative.

7  Harman also testified that Zhang came up with the $250,000 figure and that he had not asked for

8  a specific amount.

9      While Zhang may have indicated that $250,000 was the maximum that she was willing to

10 invest, the Court finds that the $250,000 amount was agreed upon by the parties.  It is the figure

11 that Harman put in the First Operating Agreement and which Zhang sent to him through

12 Conjunction.  Up to that point, Harman had not prepared a proposed purchase list.  It appears that

13 Harman felt that $250,000 would be enough to begin the business and that Zhang agreed that this

14 was an amount that she was willing to risk.  The money would go as far as it would go.[3]

15     As to making a profit from appreciation rather than rentals, this may have been a

16 miscommunication.  As noted below, Harman reported initial appreciation when the lenses were

17 purchased and never gave specific figures for rental income.  But it later became clear that while

18 Harman claimed that he bought the lenses at a price below market, he had no independent

19 information or appraisal on which to base this statement.  Further, the lenses were only getting

20 more out-of-date.  Time was not on their side.  But Harman did not explain this to Zhang.

21     Harman told Zhang that her investment would be secured by the equipment, which would

22 be insured, and that she would own the equipment until her investment was repaid.  After that,

23 the equipment would belong to a new company named APC Tech, LLC ("APC") and that Zhang

24 would have a percentage interest in APC.  Zhang agreed to this.[4]

25

26

---

27 [2] Zhang Decl., ¶¶ 22, 24 [doc. 55].

[3] The question was raised whether Ms. Zhang could have wired the $250,000 to the Conjunction bank account
28 without Mr. Harman giving her the instructions to do so.  This is a fallacious argument because Zhang had been
wiring money to Conjunction for years as part of her astrology relationship with Harman.

[4] Zhang Decl., p. 6:14-8:1 [doc. 55].

### 1.    The First Operating Agreement

At 12:31 a.m. PT on February 9, 2017,[5] Harman emailed Zhang a document titled "Preliminary Operating Agreement – Member Managed" (the "First Operating Agreement").[6] Harman had prepared the First Operating Agreement from a template and obtained certain required information from Zhang before he sent it to her.[7] Harman also sent her a copy of the signature page of the First Operating Agreement which he had already signed.[8] And according to Zhang, he called her and told her that "according to astrological time calculations," she must sign the First Operating Agreement "within the next hour or two" for the business to be a success.[9]

Although Zhang wanted to have her lawyer review the First Operating Agreement before she signed it, she rushed home, signed the First Operating Agreement, and immediately sent the $250,000 to Conjunction as her initial contribution to APC.[10]   There is no evidence that at any time she had her lawyer review the First Operating Agreement or that she sought to make any changes or clarifications to it.

The First Operating Agreement provides, in relevant part[11]:

> **1.6   Purposes and Powers**. *The Company is formed for the purpose of engaging in the business of* <u>*Purchasing Vintage and Modern Professional Motion Picture Equipment for lease and rental in the Motion Picture Industry*</u>. *The Company has the power to do all things necessary, incident, or in furtherance of that business.*
>
> **1.7   Title to Assets.** Title to all assets of the Company will be held in the name of the Company. No Member has any right to the assets of the Company or any ownership interest in those assets except indirectly as a result of the Member's ownership of an interest in the Company. No Member has any right to partition any assets of the Company or any right to receive any specific assets upon liquidation of the Company or upon any other distribution from the Company.

\* \* \*

---

[5] For consistency, the Court refers to all times in Pacific Time (PT) when describing the sequence of emails exchanged between the parties, who were located in different time zones. Harman was based in Los Angeles; Zhang was based in Switzerland and, at some points, Barcelona.
[6] Exhibit 20; Exhibit 203.
[7] Trial Transcript for 3/11/25, p. 149:20-23 [doc. 96].
[8] Exhibit 21.
[9] Zhang Decl., ¶ 32; Trial Transcript for 3/10/25, p. 134 [doc. 95].
[10] Zhang Decl., ¶ 33; Exhibit 23; Exhibit 205.
[11] Exhibit 20; Exhibit 202 (**bold** and <u>underlining</u> in original; emphasis added by the Court is in *italics*).

**2.1  Initial Members.** The names and addresses [*addresses removed by the Court*] of the Members of the Company, the amounts of their initial capital contributions, and their initial Ownership Interests are:

| Name and address.. | Contribution | Ownership Interest |
|---|---|---|
| Jeffrey A. Harman... | CEO/Manager | 60% |
| Huan Zhang... | Member | 40% |

Each Member's Ownership Interest at any time will be determined by the ratio of the Member's aggregate capital contributions to the aggregate capital contributions of all Members.

**2.2  Initial Capital Contributions.** ... The initial capital contributions of 250,000.00 USD Shall be paid by Huan Zhang of *[address removed by the Court]*... must be paid to the Company, in cash, immediately after all parties have signed this agreement. The initial capital contribution of 250,000.00 USD must be made by Bank Wire Transfer.

*It is agreed, the purpose of this company would be to acquire high-quality vintage motion picture equipment which would be refurbished and used to lease to the professional motion picture industry beginning initially in the Hollywood, California area.*

All equipment shall be held as security collateral for the "Initial Capital Contributions" set forth in 2.2, above. All such Equipment shall be listed in an addendum to this agreement as security. Furthermore Company shall provide all documents showing all equipment being fully insured for both theft or any damage. Furthermore all such equipment shall be stored in a secured gated facility.

Net profits derived after reasonable company operating expenses shall be utilized to pay off the initial investment back to Huan Zhang in annual quarterly payments in the interest set forth above in **2.1 Initial Members**.

* * *

**2.4  Additional Contributions.**  Except as otherwise provided in the Act, no Member will be required to contribute additional capital to the Company. Additional capital contributions to the Company may be made by the Members only with the Members' unanimous approval. If the Members approve additional capital contributions, the Members must set a maximum amount for such contributions that will be accepted from the Members. Each Member will then have the right, but not the obligation, to contribute a pro rata share of the maximum based upon the Member's Ownership Interest. If any Member elects to contribute less than the Member's pro rata share of the maximum, the other

Members may contribute the difference on a pro rata basis in accordance with
their Ownership Interests or on any other basis they may agree upon.

The First Operating Agreement is absolutely clear that APC's purpose was to buy and refurbish high quality vintage motion picture equipment to rent to the motion picture industry. Although appreciation would be desired, it was not the stated business purpose of APC. As discussed below, the two sections emphasized by the Court in italics were later revised to allow APC to produce motion pictures.

Harman sought to register APC in both Delaware and California. On February 15, 2017, he notified Zhang that this was going forward and that APC would be using Conjunction's bank account until it was complete.[12] Harman was of the belief that in order to set up the bank account for APC at Wells Fargo, Zhang had to be present. In that way, she could be a signatory and perhaps it was necessary for her to sign on as a Member.[13] So, by February 26, 2017, Harman had asked Zhang to set up a trip to the United States. She sent him a series of possible dates with May 23 through June 2 as the first totally free time period. It is interesting that Zhang ends her email with the sentence that she is "[L]ooking forward to make progress into the new and learn something with new experience."[14] This could mean learning about how the lenses would be used and maybe seeing them in action. Or it could mean to become more involved in the movie industry.

## 2.    *Harman Purchases Film Equipment*

Almost immediately after receiving the $250,000, Harman bought several vintage cinema lenses and ancillary equipment (the "Film Equipment").[15] At 2:30 p.m. PT on February 17, 2017, he informed Zhang that they had "already made nearly 40 or $50,000 in equity" on the Film Equipment.[16] This statement was without any foundation as to the actual value, though Harman had a sound reason to know that the Film Equipment was valuable.[17] On March 23, 2017,

---

[12] Exhibit 24.
[13] The Court does not know whether this is correct or not, but that is not relevant.
[14] Exhibit 212.
[15] Exhibit 28 ("Current Equipment Inventory List").
[16] Exhibit 25. However, Harman testified that he had no independent basis for the statement of value over the cost of purchase.
[17] Trial Transcript for 3/12/25, pp. 9:2-10, 9:16-20, 11:3-9 [doc. 94].

1    Harman sent Zhang a preliminary inventory and certificate of insurance on the Film

2    Equipment.[18]

3         For purposes of this adversary proceeding, the Court finds that the Film Equipment was

4    purchased, insured, and is still in existence.  The Court also finds that other than the $250,000

5    initial contribution to APC, Zhang paid nothing for the Film Equipment, its insurance, or its

6    storage.  Since acquiring the Film Equipment, Harman has received some minimal rental fees,

7    which he has used to pay for insurance and storage fees.  At this point in time, the Film

8    Equipment is in the possession of Harman and cannot be sold without Zhang's consent, which

9    she has not given.  The Court makes no finding as to the value of the Film Equipment.  However,

10   the Court does find that the Film Equipment rental venture never took off and that Harman had

11   and has doubts about the feasibility of it for several reasons, including that the Film Equipment is

12   not up-to-date technology and therefore is only useful for filming that intends to create a "dated"

13   look.  While he did not hide the specialized nature of the Film Equipment, he did fail to reveal to

14   Zhang that Conjunction was not a profitable rental business and that he "never thought the [Film

15   Equipment rental venture] was going to be profitable."[19]

16        Harman does not appear to have told Zhang that they would make money only if the Film

17   Equipment was rented by a small production that wanted it for a number of days or weeks and

18   that this was a limited set of potentials customers.  Harman was never successful in meeting

19   these limitations so as to generate a profit.  As to his representation of the equity, there is no

20   basis in the evidence to support that assertion and Zhang was not looking to hold the Film

21   Equipment for eventual appreciation.  The business that Harman presented was one of steady

22   income in part because this Film Equipment was unique in that at least some of it had been used

23   by Alfred Hitchcock.  But he had no realistic basis for his statements to Zhang either as to the

24   equity or the expected income from ownership of the Film Equipment.

25

26

27

28   [18] Exhibit 28.
     [19] Trial Transcript for 3/11/25, p. 4:14-15 [doc. 96].

1    Starting in April 2017, Harman periodically sent emails seeking renters for the Film

2  Equipment (though this may have included equipment owned by Conjunction).[20]  This yielded

3  little results.

4    It is clear that Harman misrepresented to Zhang the value of the Film Equipment, though

5  there is no evidence of its actual value and whether she has been damaged. But as later events

6  show, Harman did have an ulterior motive – to have the tools necessary to produce an

7  independent film that would bring income into his family through ongoing salaries paid to

8  Camille, Aidan, and himself.  Beyond that, if he chose the right vehicle and things worked out as

9  planned, there could be substantial profits to be made.  He hoped that Zhang would be the major

10  financier of whatever film he would make – once he found the right script.

11    **D.    *The RR Film Venture***

12    The major issue in this adversary proceeding concerns a script called *Riley's Rainbow*

13  ("RR").[21]  The synopsis of the story is as follows:

14
> After teen, farm girl Riley, loses her mother in a rodeo accident, she struggles
15  > with her ruggedly handsome father Travis, a veteran with PTSD and financial
  > troubles, who is uncomfortable with his daughter riding her mother's horse. He's
16  > also against Riley dating the cute boy at school, Conner *[who was to be played by
  > Aiden]*. Out of jealousy, Amber, the wealthy, high school, rodeo queen plots
17  > against Riley and Dennis, the new African American kid at school. Harper, Travis'
  > former girlfriend waits patiently to help him recover from his wife's death, and
18  > offers advice on raising a daughter. Sheriff Madison, and his friend Emmett,
  > Travis' father-in-law and the owner of the rodeo grounds, also want to help Travis
19  > heal and keep it together. The town drug dealer, Charlie, and his son, school bully,
  > Mark, add to the difficulties that Riley, Conner, and Travis face in this small town
20  > where the beautiful, northern California landscape hides old and new rivalries.
21  > The action culminates at the big rodeo, where the stakes are life and death, and
  > push comes to shove, old west style.[22]
22

23    Even before the First Operating Agreement was signed and the equipment was

24  purchased, Harman was looking for a script that he could produce and that would be appropriate

25  to film with this kind of equipment.  Harman was not in a financially safe position, though not

26

27  [20] Exhibit 261; Exhibit 262.
  [21] Riley's Rainbow was renamed several times as scripts were revised, but it is the same project and is referred to as
28  RR throughout this memorandum.
  [22] Exhibit 52, p. 006.

1    impoverished.  Working on a somewhat successful film would give him much-needed income

2    both as director and producer and later (potentially) as a shareholder in the profit.

3           Though he did not have a particular script in mind, Harman definitely thought that his

4    business relationship with Zhang might cover more than just the Film Equipment rental venture.

5    There were communications between February and May indicating that Zhang was interested

6    enough in Harman's talk of film production that Zhang offered to make contact with someone

7    she knew in Switzerland to inquire about such distribution in China.  But there is no evidence

8    that this communication and early involvement of Zhang in information about a film production

9    went further than that.

10          There is a dispute as to when Harman became aware of the RR script.  The evidence

11   shows that Camille did not reach out to find a suitable script until March 8 (a month after

12   Zhang's $250,000 was received) and that Harman first read it on April 22.[23]

13          Harman saw RR as a money-making enterprise, a way to use the Film Equipment, and an

14   opportunity to use Camille and Aidan as key actors in the film.  Harman would be the producer

15   and director and that would be an additional source of income.

16          As noted, months earlier it had been decided that Zhang would travel to Los Angeles at

17   the end of May to open the APC bank account. She intended to see the Film Equipment in use

18   and to observe some of the details of filming a motion picture. Harman saw this as an

19   opportunity for him to convince her to invest in the RR film venture.  There are no specific

20   written communications between Zhang and Harman as to RR, the production of a movie, or of

21   Zhang's possible investment in that film.  She certainly wanted to see the Film Equipment in use

22   and learn more about the movie production business.  She also was interested in learning about

23   "the potential project that we could do in the future."[24]

24

25

26

27   ────────────────────

28   [23] The portions of Exhibit 289 that were used to refresh the recollection of Camille.
     [24] Exhibit 215 and later general communications; Exhibit 251.

### 1.    *Zhang Visits Los Angeles*

On May 29, 2017, Zhang arrived in Los Angeles.  At that point, she knew that Harman had a potential project for the two of them to do through APC, but she did not know the details.[25] So the next day, when Harman met her at the hotel, for the first time he told her about RR and some of the specifics of that opportunity. He told her that the budget for the film would be below $500,000 and he sent her a diagram of the film set.[26] There is no evidence that he asked her to commit to invest at that point in time.

On May 31, 2017, they met again at the hotel and Harman told her that the proposed budget had increased to $631,092 because of negotiations with Robert Duvall, an Academy Award-winning actor who would appear in RR.  Other than checking for their availability, there is no evidence that there were meaningful negotiations with Robert Duvall, although on June 10 Harman wrote that "we are in negotiation with the agents of Robert Duval (an Oscar/Academy Award winning actor) and Chris Cooper (and Oscar/Academy Award winning actor)" and that security deposits are needed to secure these actors.[27] But no written proposals have been put in evidence.

Later that day, Zhang visited the set of RR to see a screen test for RR and she met some of the principal cast (not Duvall) and the writer.  From Zhang's point of view, this had a triple benefit: to check out the Film Equipment, to see how it is used to make a film, and to learn more about the RR film venture that Harman had suggested.

There is no record of any interaction with Harman on June 1, 2017; on June 2, 2017, Harman took Zhang to the dentist to get a crown repaired. On June 3, 2017, Harman took Zhang to a branch of Wells Fargo to open the bank account for APC and then they went to Belle Bakery Café in Studio City where they met Joshua Vancil.[28] Vancil was a professional feature-film producer and line producer who worked for Paramount Studios and independent film

---

[25] *See* Exhibit 251.
[26] Exhibit 29.
[27] Exhibit 248.
[28] *See* Exhibit 254; Exhibit 234.

1    companies.[29]  At this meeting, Vancil signed the "Line Producer Agreement" between himself

2    and APC, committing him to work on RR.[30]  Zhang did not read the document but signed as a

3    witness on Harman's request.  There was no reason stated why this document had to be

4    witnessed by a third party, although Harman may have felt that it was wise to have the other

5    partner in APC acknowledging it.

6        There is no evidence of any conversation on June 3 between Harman and Zhang

7    concerning APC's involvement in the RR film venture or the contract with Vancil.  But it is hard

8    to imagine that Zhang was not aware that Harman signed the Line Producer Agreement on behalf

9    of APC because the page on which she signed contained almost no writing other than the two

10   signature blocks.  Zhang signed as a witness below and to the right of Harman's signature which

11   clearly stated that it was on behalf of "APC Tech LLC, (EXECUTIVE PRODUCER)."[31]

12       By that point, Zhang knew that APC was committed to the RR film venture and that

13   Harman would be the executive producer.  She also knew that APC had only an insignificant

14   amount of cash and that she and Harman would have to agree on the amount of an additional

15   contribution that she would make and/or adding new members and their contribution.  She was

16   aware that Harman was not financially able to contribute cash or invest his own assets in APC

17   and the RR film venture.

18           *2.    The Second Operating Agreement*

19       On June 4, 2017, when Zhang was preparing to return to Switzerland, Harman met her at

20   her hotel to urge her to sign the necessary documents to define her investment in the RR film

21   venture through APC.  Harman brought with him a written proposal, a computer, and a printer.

22   As they talked, he revised the First Operating Agreement to change the purpose of APC from

23   solely the "purchase and rental of filming equipment" to include "engaging in the production of

24   motion pictures."  This revised Operating Agreement (the "Second Operating Agreement") was

25

26   _____

27   [29] Joshua Vancil Obituary, *Cook Family Funeral Home & Cremation Service*,
     https://www.cookfamilyfuneralhome.com/obituaries/joshua-vancil.

28   [30] Exhibit 31.
     [31] Exhibit 31.

mostly identical to the First Operating Agreement that was signed on February 9, but paragraphs 1.6 and 2.2 now read in pertinent part:

> **1.6  Purposes and Powers**. The Company is formed for the purpose of engaging in the business of the production of motion pictures and purchasing vintage and modern professional motion picture equipment for lease and rental in the motion picture industry. The Company has the power to do all things necessary, incident, or in furtherance of that business.
>
> * * *
>
> **2.2  Initial Capital Contributions.** … It is agreed, the purpose of this company shall be to produce motion pictures and or acquire high-quality vintage motion picture equipment, which may be refurbished and used to lease to the professional motion picture industry beginning initially in the Hollywood, California area. [32]

Harman and Zhang both signed the Second Operating Agreement on June 4, 2017, but the date of signatures remained February 9, 2017.

### 3.    *The Motion Picture Contract*

At the same time, Zhang signed a "Motion Picture Deal and Stock Holder Agreement" (the "Motion Picture Contract").[33]  While she signed the Second Operating Agreement in the full knowledge that APC intended to expand into the motion picture production business and that the RR film venture would be its first undertaking, she understood that the Motion Picture Contract was provisional. She signed that document immediately only because Harman told her that June 4 was an auspicious date to sign and that she could review both agreements and do her due diligence at a later time. So, given those assurances, she signed both agreements.

One of the things that Zhang requested was an individual taxpayer identification number (ITIN) and a visa or green card so that she could come to the United States to work on the movie or do other business.  Harman immediately began the process of obtaining an ITIN for Zhang.[34]

Zhang was not happy about signing the Motion Picture Contract without time to get input. She later confirmed the lack of prior discussions when she wrote Harman that they "had to run for everything" and she would have appreciated more details before she came to Los Angeles

---

[32] Exhibit 22.
[33] Exhibit 33.
[34] Exhibit 242.

so that she could have had her team on "standby to offer long-distance consultation" at that time.[35]

It is clear that the Motion Picture Contract was skeletal and had not been reviewed by an attorney. It contained no mention of further investment or of allocation of losses. It limited Zhang's contribution to the aggregate amount of $631,092, payable in three installments of $210,364. All installments were to be completed within 45 days after execution. There was no provision for third party investment in the event that the RR film venture exceeded the $631,092 budget.[36] Certainly, Harman knew that it is not unusual for movies to exceed their initial budget.[37] And, in fact, by February 2018, Vancil estimated that the actual budget would be about $2.4 million.[38]

As the later emails show, Zhang expected Harman to send her detailed plans for production and distribution for the RR film venture and that they must meet her satisfaction. She also believed that Harman had agreed not to move forward until she and he had worked out the details and her attorney had been able to review the paperwork. Moreover, she expected that she would have access to an American attorney who was conversant with contract law.

### E.    *Zhang Returns to Switzerland, Wires $210,364 for the RR Film Venture*

Zhang departed for Switzerland on the afternoon of June 4 and arrived on the morning of June 5. On June 6, 2017, she transferred $25,000 to Conjunction's bank account as a preliminary loan so that Conjunction could engage Vancil as the line producer for RR and also to pay Gunnar Garrett for an option to purchase the RR script, which he had written. On June 7, 2017, Garrett signed the "Script Option Agreement"[39] and the "Purchase Agreement (Short Form)"[40] and was paid $7,000 for a twelve-month option to purchase. Under these agreements, the purchase price of the RR script would be $46,000 but that was not paid at this time. This $25,000 was seen by

---

[35] Exhibit 251.
[36] Exhibit 33.
[37] *See, e.g., 12 Massively Over-Budget Films That Every Film Producer Can Learn From*, NYFA, https://www.nyfa.edu/student-resources/12-massively-budget-films-every-film-producer-can-learn/.
[38] Exhibit 53.
[39] Exhibit 34.
[40] Exhibit 244; Exhibit 51.

1  all parties as a loan for some initial payments on the RR film venture. It was paid back to Zhang

2  by Camille in July 2017.[41]

3       Once Zhang returned to Switzerland, she had her advisers review the agreements and she

4  felt that there were loose ends that needed to be tied up.  Principally, these concerned what risks

5  existed if the RR film venture lost money and how that loss would be divided between Harman

6  and herself. Zhang expressed these concerns to Harman and suggested that her money be a

7  personal loan to Harman rather than an investment.[42]  The record contains no response to this

8  suggestion.

9       On June 8, 2017, Zhang initiated a series of email conversations with Harman about the

10  RR film venture. By that point, she had talked to her "Swiss economist," who advised her to

11  make the funding in the form of a personal loan to APC rather than as a member investment.[43]

12  She next requested more information on the potential target sales for the RR film venture. She

13  wrote:

14       But at least the movie should produce CHF632000.00 to recover the capital
15       investment and of course, your time and your amount of work input should be
        rewarded.. so I want to ask you how much the target Sales success of RR should
16       be so that as the director who dedicates a lot of amount of work and investment of
        energy in this project, you consider your efforts are rewarded.... my minimum is
17       not to lose the cHF632000.00 while having the other CHF250,000.00 gradually
        being returned through years as we originally planned.. am I realistic in my vision
18       of the minimum return of this operation,,. Will I be losing further than that?? I
        want to hear from you.[44]
19

20       On June 8, 2017, Harman messaged Zhang via WhatsApp and told her that he needed her

21  initial investment by Friday, June 9.[45]

22       On June 9, 2017, Zhang initiated a wire transfer to APC in the amount of $210,364.[46]

23

24

25  _____

26  [41] There is not evidence as to the source of repayment and neither the loan nor any repayment appears in Exhibit 61.
    [42] Exhibit 245.
27  [43] Exhibit 245.
    [44] Exhibit 245.
28  [45] *See* Exhibit 247.
    [46] Exhibit 36.

### F.    Zhang Begins to Question the RR Film Venture

At 5:29 a.m. PT on June 9, 2017, Zhang emailed Harman to confirm that she sent the $210,364.[47] In her email, Zhang questioned why he insisted that she send the funds on Friday rather than waiting until the following Monday or Tuesday. She stated that the urgency caused her and her team "stress and unease." Zhang went on to insist on getting a fuller understanding of what the money was to be used for and the negotiation process with the actors, particularly because she and Harman had not yet fixed the risk commitment between them:

> 3. I suppose if now you use any amount out of USD 210,364.00 to book any actors and later on we have problem to finalize our internal agreement, we will not be able to take back the deposits you pay? So I wish to discuss us once on this weekend before any further step on RR and hear from you to decide if we shall move forward or backward. Maybe this is not the best time we move backward but it is neither not the worst time to do so. I can also bridge the financing of RR until you find the next sponsor to step in in the case of my leaving this project. As I said, I do not wish to make you in trouble but I have some questions needing to get clarified with you before I have to take the 100% risks on money.

> 4. For now I felt like you would have me be responsible for any next step you should or should not take on RR. I need to understand from you of your perspectives and your own commitment on RR production.

> In short, we have to speak again before you take any next step/bookings under RR production. I did make the money available to you on this round as per your request but I would like us to have a review of our situation in forward or backward scenario to have a choice.[48]

This was the beginning of a series of emails in which Zhang speaks about pulling out of the RR film venture but does not actually do so. She is greatly concerned about reaching an agreement on sharing losses and how Harman would use the money that she sent. She also expressed that APC should concentrate on the Film Equipment rental venture; the RR film venture should be separate.

---

[47] Exhibit 247.
[48] Exhibit 247.

1    At 11:31 a.m. PT on June 10, 2017, Harman replied to Zhang's email. Harman

2    acknowledged receipt of the first $210,364 and indicated that he was preparing a detailed

3    response to Zhang's concerns.[49]

4    At 2:52 p.m. PT on June 10, 2017, Zhang sent a reply email identifying additional

5    concerns she had. As an initial matter, she asked Harman for the draft "on risk sharing issues and

6    to decide if to go further ahead with RR or we need to consider risks/consequences and to

7    withdraw." After stating that she would have liked the appointment of a legal representative to

8    advise her on the responsibilities and rights under an American contract, Zhang went on to

9    comment on all the rush and that this was not a normal business decision-making process for her.

10   She wrote that a business like APC usually would operate for a few years before committing to a

11   larger investment. She further noted that it was "somewhat important" to her that, in the "rare

12   case" the RR film venture resulted in a loss, Harman would share in that loss at a 60%/40%

13   ratio.[50]

14   At 8:16 p.m. PT on June 10, 2017, Harman sent a reply to which he attached an executed

15   copy of the Script Option Agreement and a Word document containing a detailed response to

16   Zhang's concerns. As to the rush for the first $210,364, he needed it to "be able to proceed with

17   confidence with my production staff and to pursue the immediate one-year option of the script"

18   from Garrett, to whom he paid $7,000. He indicated that APC would own clear title to the RR

19   script once APC exercised that right pursuant to the Script Option Agreement. Harman

20   understood acquiring rights to the RR script to be the first step in the RR film venture, stating, "I

21   intend to pursue the final purchase negotiation with Gunnar Garrett after you and I agree to move

22   forward and to complete it as soon as possible." He then noted that APC was in negotiations with

23   the agents of Robert Duvall and Chris Cooper and would need a security deposit in order to

24   secure these actors. Harman requested that Zhang reference the budget that he gave her on June

25   4, which purportedly contained the foregoing information.[51]

26

27
─────────────────
28   [49] Exhibit 248 (email with subject line, "Preliminary response to your last email and moving forward").
     [50] Exhibit 248 (email with subject line, "Re: Preliminary response to your last email and moving forward").
     [51] Exhibit 248.

Harman then stated:

> As I had mentioned, this film would cost a minimum of approximately $1.5 million USD to produce as an independent, SAG (Screen Actor Guild) Modified low budget film and at least $5 to $10 million or much high [sic] under a major studio production, due to union and legal costs. However, because of my extensive personal and professional experience, resources and contacts in the entertainment industry for over 38 years and my unique array of motion picture production equipment owned by my company, Conjunction LLC, we are able to produce this film *Riley's Rainbow*, WGA#1824264, as per the additional internal cash budget you have agreed to provide of $631,092.00, as set forth in the addendum to our agreement, (entitled: MOTION PICTURE DEAL And STOCK HOLDER AGREEMENT, executed by you and me, at the Beverly Wilshire Hotel dated 6-4-17.)[52]

As to his lack of cash investment, Harman went on to explain that he and Camille are providing their personal resources and the resources of Conjunction, which keeps the cost down from $1.5 million. He further explained that the resources of Conjunction will be directed to the RR film venture and not to other income producing tasks, and that he and Camille will not be able to earn other income during the production of the RR film venture. He represented that because Conjunction's equipment and inventory will be used for the RR film venture, Conjunction will suffer a loss of income of approximately $300,000 in 2017; otherwise, Conjunction's gross income would be approximately $650,000. He also noted that he, Camille, and Aidan will be putting in significant time in the RR film venture.[53]

Harman then clarified that the upside is not $1.5 million, but $3-$5 million:

> In this industry, most people who invest in movies get their money back and are phased out after 3 years of investment participation. We have brought you in as a partner in perpetuity on this film. You will enjoy, as we will, continuing royalties for years to come and, as Executive Producer, the enjoyment and satisfaction of knowing you were a key player on the team making this happen.[54]

On June 11, 2017, after Zhang received Harman's detailed response, the parties spoke on the phone and reached a general understanding. At 4:50 p.m. PT on June 11, 2017, Zhang

---

[52] Exhibit 248.
[53] Exhibit 248.
[54] Exhibit 248.

-17-

1  emailed Harman and stated that there should be no further steps on the RR film venture until

2  they agree on the 60%/40% sharing of the profit and also using the same ratio to share any loss.

3  She told him that although she had wired the $210,364 per his request, he was to hold back on

4  using this money for any further steps on the RR film venture until they clarify the risk

5  agreement. She stated that she would not agree to accepting the full risk of the $631,092. As to

6  the numbers that he gave her, for the moment she is taking them "for reference without being

7  verified."[55]

8       At 11:17 a.m. PT on June 12, Zhang emailed Harman asking to see the draft of the

9  wording. She wanted to know how they could settle this if she decided to immediately withdraw

10 from RR and she sought more information about a distribution deal. She set forth the shooting,

11 post-production, and distribution dates that Harman had given her and asked that Harman

12 confirm these.[56] And she informed him that she will want a U.S. based lawyer as well as her

13 Swiss lawyer to review the contract.[57] At 1:52 p.m. PT on June 13, Zhang emailed Harman

14 asking for the draft amendment.[58] At 11:46 p.m. PT on June 13, Harman wrote to Zhang via

15 WhatsApp message, stating that they "can proceed with the 50% warranty and if [Zhang] need[s]

16 to go to an attorney, that is fine."[59]

17      Just before 6:00 a.m. PT on June 14, 2017, Zhang replied to Harman via WhatsApp

18 message to again express her discomfort about the way that things were being handled. "I have

19 never enter into a business in such a way always under stress, thus I do have unease with if I

20 should keep trusting or stay back." Again, she wanted figures and to understand Harman's

21 situation.[60] At 1:52 p.m. PT on June 14, Zhang emailed Harman asking again for the draft

22 amendment and for clarification of the original documents, especially concerning what company

23

24

---

25

26 [55] Exhibit 249.
   [56] The email sets forth the dates as shooting in June-July, post-production July-September, and check distribution
27 deal negotiations with distributors September-October.
   [57] Exhibit 250 (email with subject line, "conversations on RR today").
28 [58] Exhibit 250 (email with subject line, "amendment draft RR").
   [59] Exhibit 251.
   [60] Exhibit 251.

1    expenses will have priority over the repayment of her $631,092 investment. She noted that in the

2    budget, Harman is to receive $71,000 as his director's fee.[61]

3          After June 14, 2017, there was silence from Harman for a week while he dealt with other

4    personal issues and local conditions. But on June 22, 2017, he sent Zhang an "Addendum to

5    Motion Picture Deal and Stock Holder Agreement," (the "Motion Picture Contract Addendum")

6    which Harman and Camille had signed.[62] Although Camille was not identified as a shareholder

7    in the Motion Picture Contract, apparently she is included in the Motion Picture Contract

8    Addendum because she, Harman, and Conjunction are taking on a 60% risk.[63] There is no copy

9    of the Motion Picture Contract Addendum in evidence that is signed by Zhang; therefore, the

10   Court finds that she did not sign it.

11         On June 23, 2017, Zhang responded from Barcelona and again reiterated that they needed

12   to work out the "setup, structure, admin, RR production details (business plan n [sic] working

13   plan/ schedules etc) before we should take any further steps re RR."[64] While Zhang was willing

14   to participate in the Film Equipment rental venture, she was not willing to take on the larger risk

15   of the RR film venture under the terms of the Motion Picture Contract. And she did not want

16   Harman to proceed until they worked out all the details.

17         Harman's response on June 24, 2017, is equally unambiguous. He intended to go forward

18   as was their agreement under the Second Operating Agreement, which provided that APC's

19   purposes included "the production of motion pictures."[65]

20         On June 25, 2017, Zhang sent a lengthy reply setting forth her side of what had happened

21   thus far.[66] The Court summarizes the content of her email as follows: Zhang made it clear that

22   there was no meeting of the minds with Harman, that she had felt pressured, and that she never

23   intended to move forward without legal advice.  Zhang then recapped the issues that the series of

24

25   [61] Exhibit 250 (email with subject line, "several topics").
     [62] Exhibit 252.

26   [63] Exhibit 40, pp. 005-006 (email with subject line, "Touching Base"). Zhang asserts that this was on June 15, but
     the email sending the addendum is dated June 22, 2017. The signatures of Harman and Camille on the Motion

27   Picture Contract Addendum are dated June 15, 2017.
     [64] Exhibit 40, pp. 004-005 (email with subject line, "Re: Touching Base").

28   [65] Exhibit 40, pp. 003-004 (email with subject line, "RE: Response to you last email").
     [66] Exhibit 40, pp. 001-003 (email with subject line, "Re: Response to you last email").

emails between June 5 and June 23 had raised. She reiterated that she wanted Harman to take seriously her request to exit the RR film venture and that she had been asking him to "hold the RR production without committing any further steps to third parties until we clarify if I stay in RR project or we have to change the plan and you should find new funding for your interests in RR."

### G.   The Parties' Relationship Breaks Down; Zhang Pulls Out of the RR Film Venture

At 7:56 a.m. PT on June 27, 2017, Zhang pulled out of the RR film venture.[67] In response, Harman wanted to make sure that she intended the RR film venture to end and he pushed her to notify him whether she (a) would continue to perform under the Motion Picture Contract or (b) that she was "officially breaching the contract."[68]

On June 28, 2017, Zhang responded with another long email, the gist of which is that the RR film venture was provisional and had not been finalized.[69] She states, "I am in this stage asking to step out of you [sic] required financing commitment and requiring you to seek for alternative financing partner to join as you wish to carry it forward."

The email communications continued.[70] At some point, Cameron Mabrie of Sheppard Mullin Richter & Hampton LLP entered the email chain; Zhang had hired that firm to represent her.

On July 3, 2017, Zhang emailed Harman with several requests concerning APC and the Film Equipment rental venture, including a series of revisions to be made to the Second Operating Agreement.[71] Harman later responded to each request.[72] In her email, Zhang also stated:

> Re RR, the initial legal consel [sic] confirms that a new entity must be formed to operate as the production company for the Film RR. And there are important

---

[67] Exhibit 41, p. 004 (Zhang states, "I go not further.").
[68] Exhibit 41, p. 003 (email with subject line, "RE: Need for specific and clear communication now").
[69] Exhibit 41, pp. 001-003 (email with subject line, "Re: Need for specific and clear communication now").
[70] *See* Exhibits 42 and 43.
[71] Exhibit 43, p. 003.
[72] Exhibit 43, p. 001; Exhibit 42, pp. 007-008.

documents under RR business plan still missing to be checked/reviewed. We will discuss RR after we settle [the requests concerning APC and the film equipment rental venture].[73]

On July 5, 2017, Harman wrote that he is working on renting the Film Equipment. As to the RR film venture, he stated that he has been moving forward since Zhang's visit to Los Angeles, where he signed the Line Producer Agreement in her presence. And while Zhang has a 40% interest in perpetuity, he stated that he was not willing to put Camille and himself on the line for a 60% loss on an unprofitable film.[74]  This arrangement may be in conflict with the Motion Picture Contract Addendum that Harman had sent on June 22, which Zhang did not sign.[75] But the arrangement appears to be more far reaching than the initial $631,092 budget and it would cover all losses.

### H.    Harman Purchases the RR Script

On July 13, 2017, Harman executed a Purchase Agreement with Garrett,[76] in which he exercised the option in the Script Option Agreement and paid Garrett $46,000 to acquire the RR script.[77] This was extremely premature. The Script Option Agreement had been signed on June 7, 2017, and, for the payment of $7,000, it gave APC until June 2018 to pay the $46,000 purchase price.[78]  There is no evidence that Zhang was aware of or consented to this premature payment. Harman offered no explanation as to why he did this when there was still almost a year remaining to make the payment in order to exercise the option.  Harman was aware that Zhang was highly likely to withdraw from financing RR and had—several times—demanded that he not make payments to people because it would be difficult or impossible to get the money back.

The only saving grace of this purchase was that it was not for past or future services; it was for a piece of intellectual property that potentially had future value, whether or not APC produced it or it was sold to some other person. The RR script is still owned by APC but has not

---

[73] Exhibit 43, p. 003.
[74] Exhibit 42, p. 009-010.
[75] Exhibit 252.
[76] Exhibit 244.
[77] Exhibit 260 (Wells Fargo Bank, N.A. Business Platinum Savings Account Statement for APC Tech LLC, July 2017).
[78] Exhibit 34; Exhibit 244.

been appraised. However, this premature act directly violated Harman's June 10, 2017, promise to Zhang that he would not complete the purchase of the RR script until they agreed "to move forward and to complete it as soon as possible."[79]

### I.    Zhang Makes Demands; Harman Continues Production of RR

On July 19, 2017, Zhang demanded a refund of the $210,364 payment plus an additional $150,000 in legal fees.[80]

Discussions continued and on August 9, 2017, Zhang emailed Harman that his commitment to a loss on the RR film venture should not be secured by the Film Equipment. She noted that leaving APC is not her "top concern," but she wants to discuss this with Harman. Harman responded, sending Zhang a project package, and telling her that he has been working on the script and it will be a wonderful movie.[81]

On August 31, 2017, Zhang wrote Harman recapping what happened with APC, noting the agreements, discussing legal fees, and telling him that she wants APC and the RR film venture separated.[82] This is consistent with her declaration and testimony in this adversary proceeding. The evidence presented does not include a response to this email.

There is evidence and testimony about what happened once Zhang pulled out. Harman kept moving forward with production on the RR film venture, unsuccessfully sought other investors, and also tried to rent-out the Film Equipment (with practically no success and little income). The budget projection for the RR film venture increased to over $2.4 million and Harman entered into a revised line producer agreement with Vancil that made Harman, not APC, responsible to pay Vancil.[83]

### J.    Zhang Files the State Court Action

On August 14, 2018, Zhang filed a complaint against Harman and APC in Los Angeles Superior Court (the "State Court Complaint"), initiating state court case no. BC717682 (the

---

[79] Exhibit 248.
[80] Jeffrey Harman Decl., p. 12 [doc. 71].
[81] Exhibit 52, pp. 002-003; Exhibit 258.
[82] Exhibit 259 (resent on September 1, 2017).
[83] Exhibits 53, 54; Exhibits 263, 268.

1  "State Court Action").[84]  In the State Court Complaint, Zhang asserted claims for: (1) breach of

2  contract; (2) fraud and fraudulent inducement; (3) undue influence; (4) violation of California

3  Penal Code § 496; (5) breach of fiduciary duty; (6) intentional infliction of emotional distress;

4  (7) negligent infliction of emotional distress; (8) declaratory relief; and (9) an accounting.

5  Harman filed an answer and cross-complaint to the State Court Complaint.[85]

6  ### K.    RR Film Production Ceases

7  Harman testified that the filing of the State Court Complaint effectively stopped all work

8  on the RR film venture. The Court agrees with Harman that once Zhang filed the State Court

9  Complaint, it became impossible to get other investors because APC owned the script and was a

10  defendant. Harman testified that the main actors pulled out, but there is no evidence as to who

11  was under contract. In June 2018, Harman started to try to hire Mickey O'Rourke and in August

12  there was an offer to hire Michael Madsen, but no signed agreements are in evidence.  As to

13  Robert Duvall, there is no evidence that he even considered acting in this film, though there was

14  some reaching out to his agent.

15  Harman testified that because of the State Court Action, production ceased and the

16  money that had been put in—and was paid out for salaries, etc.—was gone with no way to

17  recover it.  There is also no evidence that there was any investment in the RR film venture other

18  than the $210,364 sent by Zhang and another deposit of $13,000 from an unknown source. The

19  evidence shows that almost all of the $210,364 was spent by the time that the State Court

20  Complaint was filed; Harman received some $69,000 in 2017 for salary and reimbursement and

21  $24,000 in 2018 for salary. Vancil received a total of $54,000. Garrett received $53,000.[86] APC's

22  cash flow for 2017 and 2018 is as follows:

| Film Equipment Rental Venture | | |
|---|---|---|
| | 2017 | 2018 |
| Income | | |
| Zhang | $249,982.50 | |

[84] Ex. 3.
[85] Bisconti Decl., Ex. 3 (Harman's and APC's answer) [doc. 26].
[86] Exhibit 61.

|  | | |
| --- | --- | --- |
| Equipment rental Expenses | | $1,050.00 |
| Equipment purchase | ($226,581.17) | |
| Other costs | ($8,491.15) | ($9,848.59) |
| **Remaining Balance** | **$14,910.18** | **$6,111.59** |

| **RR Film Venture** | | |
| --- | --- | --- |
| | 2017 | 2018 |
| Income | | |
| Zhang | $210,346.50 | |
| Deposits | $13,000.00[87] | |
| Expenses | | |
| Vancil | ($24,000.00) | ($30,000.00) |
| Garrett | ($53,000.00) | |
| Harman | ($69,666.70) | ($24,000.00) |
| Other costs | ($10,019.00) | ($11,918.00) |
| **Remaining Balance** | **$66,960.80** | **$1,042.80** |

### L.    *The State Court Conducts Trial, Enters Judgment in Favor of Zhang*

From January 31 through February 3, 2022, the state court conducted a bench trial.[88]  At the trial, witnesses were sworn and testified, and evidence was presented on the claims asserted in the State Court Complaint.  In addition, the state court requested a post-trial submission of authorities from the parties.

On February 23, 2022, the state court issued a minute order ruling in Zhang's favor as to the investment under the Second Operating Agreement (the "February Order").[89] In the February Order, the state court held—

> The Court, having taken the matter under submission on 02/03/2022 for Non-Jury Trial/Short-Cause, now rules as follows: The Court adjudges and decrees that Plaintiff Huan Zhang, is to received [sic] from Defendant Jeff Hartman [sic] and APC TECH, LLC jointly and severally, the sum of $210,364 principal plus

---

[87] The source of this $13,000 is not in evidence.
[88] Exhibit 56, p. 001.
[89] Exhibit 55.

$99,922.71 in prejudgment interest (10% per year for 4 years 9 months) plus costs according to law.

On May 9, 2022, the state court entered judgment in favor of Zhang (the "State Court Judgment").[90]  The State Court Judgment largely echoed the February Order and stated—

> This action came on for a bench trial on January 31, 2022, and continued through February 3, 2022, in Dept. 12 of the Los Angeles Superior Court, Central District, Stanley Mosk Courthouse, Hon. Barbara Meiers presiding. Plaintiff HUAN ZHANG appeared and was represented by Jay T. Ramsey of Sheppard, Mullin, Richter & Hampton LLP. Defendant JEFF HARMAN appeared and represented himself. Defendant APC TECH LLC did not appear with counsel and could not act pro se.
>
> Witnesses were sworn and testified and evidence was presented on the claims asserted in Plaintiff's complaint. After hearing the evidence and argument from counsel, the Court requested a Post-Trial Submission of Authorities from the parties. After that submission, the Court issued its Ruling dated February 23, 2022 in favor of Plaintiff.
>
> In accordance with that Ruling, IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff Huan Zhang is to receive from Defendant Jeff Harman and APC TECH, LLC jointly and severally, the sum of $210,364 principal plus $99,922.71 in prejudgment interest (10% per year for 4 years 9 months), plus costs in the amount of $_____, including attorney's fees as may be permitted by law.

The State Court Judgment awarded prejudgment interest for 4 years and 9 months, which was the length of time between when Zhang sent the $210,364 and the date of judgment. On August 5, 2022, in connection with Zhang's motion for attorney fees, the state court entered an order (the "August Order") which stated—

> Plaintiff's Motion for Attorney Fees is denied. Although the cross-complaint does refer to a breach of the Motion Picture Contract by plaintiff/cross-defendant as having simultaneously been an automatic breach of the Operating Agreement, the cross-complaint also refers to the two contracts as being exactly that, two contracts, not one. Indeed, the second cause of action is only for the breach of the Motion Picture Contract, while the first relies on a theory that breach of the second would itself indirectly result in a breach of the first, the Operating Agreement. Plaintiff/cross-defendant in her complaint has only one breach of contract claim, to wit, a breach of the Operating Agreement, but she did not

---

[90] Exhibit 56.

-25-

prevail as to that. Therefore, [the] court did not order a refund of any money paid pursuant to that agreement. Instead, plaintiff's recovery was only as to money paid under the Motion Picture Contract, which is money she sought to recover based only on various tort theories. She did not prevail on any contract claim based on the Operating Agreement, nor did Harman. Plaintiff's Motion for Attorney Fees is denied.[91]

### M.     The Bankruptcy Case and Adversary Proceeding

On August 23, 2022, Harman filed a chapter 7 petition, case no. 1:22-bk-110981-VK. On November 28, 2022, Zhang filed a complaint against Harman (the "Complaint"), initiating this adversary proceeding.  In the Complaint, Zhang sought a determination of nondischargeability as to debts owed to her for (1) fraud and fraudulent inducement under 11 U.S.C. § 523(a)(2)(A); (2) fraud and defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4); and (3) willful and malicious injury under 11 U.S.C. § 523(a)(6).

On December 4, 2023, Zhang filed a motion for summary judgment based on the State Court Judgment, asserting that collateral estoppel precludes relitigating the Plaintiff's claims under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).[92]  On January 17, 2024, the Court denied the motion.[93]  Judge Kaufman held that the State Court Judgment was not sufficiently specific to form the basis of a nondischargeability claim under these sections.

In preparation for this trial, the parties filed a Joint Pretrial Stipulation, which Judge Kaufman approved.[94]  She then ruled that direct testimony would be by declaration and each party filed the declarations of their witnesses.[95]  Judge Kaufman then transferred the adversary proceeding to Judge Mund for trial and all further proceedings.[96]  All declarants appeared and were subject to cross-examination.  The Court ruled on the evidentiary objections to the various declarations submitted by Harman.[97]  All exhibits that were identified in the Joint Pretrial

---

[91] Exhibit 57.
[92] Motion for Summary Judgment or, Alternatively, Summary Adjudication [doc. 26].
[93] Court's Ruling [doc. 37]; Order Denying Motion for Summary Judgment [doc. 40].
[94] Pretrial Stipulation [doc. 50]; Order Setting Trial and Related Deadlines [doc. 52].
[95] Order Setting Trial and Related Deadlines [doc. 52]; Huan Zhang Decl. [doc. 55]; Jeffrey Harman Decl. [doc. 71]; Aiden Harman Decl. [doc. 71]; Camille Harman Decl. [doc. 71]; Pamela Blackwell Decl. [doc. 77].
[96] Order Reassigning Adversary Proceeding to Judge [doc. 61].
[97] Rulings on Evidentiary Objections [doc. 75].

Stipulation and discussed during the trial were admitted into evidence and a few additional

exhibits were offered and admitted.

## II.    DISCUSSION

### A.    *Responsibility for Film's Outcome*

Harman would like to blame Zhang for the downfall of the project, but the final outcome

is not the issue in this adversary proceeding.  No movie undertaking has a guarantee of success.

And even relatively successful films may not provide a monetary return to the investors.

Most films lose money.  According to one article, about 80% of them do not make money

and investing in a single film is even less likely to return a profit to the investor.[98]  An American

Film Market study estimated that about 41% of films make money, but this includes those

produced by the big studios.[99] For independent films, the estimate of success can be as low as

10%.[100]

Just as he failed to reveal to Zhang that the Film Equipment had not been appraised and

that it was unlikely to return rents anywhere like the amounts that he promised, Harman also did

not tell her about the true chances of a successful return of her money on the RR film venture.

But those figures were available to the public and, as a sophisticated businesswoman, Zhang

could be expected to have researched this before she sent the first $210,364 under the Motion

Picture Contract.

It is unknown whether Zhang conferred with anyone once she got home about the film

business or the terms of the Motion Picture Contract and the inclusion of film production in the

Second Operating Agreement.  But whether she did or not, whatever due diligence she made

convinced her that there were terms that were missing—mainly the risk of loss.

---

[98] Schuyler Moore, *Most Films Lose Money!*, Forbes (Jan. 3, 2019),
https://www.forbes.com/sites/schuylermoore/2019/01/03/most-films-lose-money/.
[99] Stephen Follows & Bruce Nash, *Do Good Reviews Lead to a Higher Chance of Financial Success?*, American
Film Market (2016), https://americanfilmmarket.com/do-good-reviews-lead-to-a-higher-chance-of-financial-success/
[100] Tom Leach, *Do independent films make money?*, Paus (Sep. 20, 2022), https://www.paus.tv/lab/do-independent-films-make-money. This article is an excellent explanation of the financing and income from independent films.

1    Harman could hope for profit, but he was receiving his salary even before RR was shot.

2    He was contracting with actors and others who would be paid whether the RR film venture was a

3    success or a flop.  Zhang had been urged to sign and invest in a rush. The Court finds that she

4    was told that the documents were preliminary to allow things to start but could be modified once

5    she had a reasonable time to do due diligence and talk to her legal advisors.

6    Harman's responses to her June 2017 questions did not give her the confidence that she

7    sought. So, she began to withdraw.  And although she dithered about it and gave Harman hope

8    that she might stay in (or at least not seek the return of her initial investment), she is not liable

9    for anything that happened after she sent her $210,364.

10    **B.    *The Role of Astrology***

11    Astrology – many people think that this is a hoax, but the Court will not deal with this.

12    Harman himself testified that a "lot of people don't believe in astrology. I don't know that I

13    do."[101]

14    Although astrology has never been verified through the western scientific method, it is

15    many hundreds of years old and uses standardized methods and charts.  It is widely accepted as a

16    part of Asian culture. The Court is not going to include an analysis of the validity or falsity of

17    astrological readings.  Just as one cannot prove or disprove the basis and practices of the various

18    religions that exist in the world.  Harman testified that while he does not express his doubt to his

19    clients, he also does not give specific advice to them. Rather he gives insights on timing and

20    cycles and tells them to rely on their own guidance and make their own decisions.[102]

21    Zhang confirmed this in her declaration when she wrote that she started consulting with

22    Harman "for astrological readings to help guide my decision-making process." And she

23    continued to seek his advice on such matters as the wall finishing to use in her home "to ensure

24    good energy for my home."[103]  He told her that her birth charts favored that she should engage in

25    a creative project and "he believed a business venture between Harman and me would result in

26

27

28    [101] Trial Transcript for 3/10/25, p. 209:3–4 [doc. 95].
[102] Trial Transcript for 3/10/25, pp. 206:20–214:20 [doc. 95].
[103] Zhang Decl., ¶¶ 16, 18 [doc. 55].

1    financial success."  And later he told her of the lens purchase possibility and that "this was a

2    great opportunity for a profitable business venture."[104]

3          The evidence shows that Harman presented Zhang with the concept and opportunity to

4    invest in the purchase and rental of movie lenses.  But it does not demonstrate that he used

5    astrology to defraud her or to injure her.

6       **C.**     ***Fraud in 11 U.S.C.§§ 523(a)(2), (a)(4), and (a)(6)***

7          The concept of "fraud" occurs in 11 U.S.C. §§ 523(a)(2), (a)(4), but is not a requirement

8    in § 523(a)(6). The Supreme Court has set forth the definition as to each of these sections:

> This Court has historically construed the terms in §523(a)(2)(A) to contain the "elements that the common law has defined them to include." *Field v. Mans*, 516 U.S. 59, 69, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Ibid. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

> And, of course, our interpretation of "actual fraud" in §523(a)(2)(A) also preserves meaningful distinctions between that provision and §§523(a)(4), (a)(6). Section 523(a)(4), for instance, covers only debts for fraud while acting as a fiduciary, whereas §523(a)(2)(A) has no similar limitation. Nothing in our interpretation alters that distinction. And §523(a)(6) covers debts "for willful and malicious injury," whether or not that injury is the result of fraud, see *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998) (discussing injuries resulting from "'intentional torts'"), whereas §523(a)(2)(A) covers only fraudulent acts. Nothing in our interpretation alters that distinction either. Thus, given the clear differences between these provisions, we see no reason to craft an artificial definition of "actual fraud" merely to avoid narrow redundancies in §523 that appear unavoidable.

*Id*. at 363.

---

[104] Zhang Decl., ¶¶ 21, 22 [doc. 55].

### D.    11 U.S.C. § 523(a)(2)(A)

A bankruptcy discharge does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

### *1.    Statements Respecting a Debtor's Financial Condition*

The plain language of § 523(a)(2)(A) excludes "a statement respecting the debtor's or an insider's financial condition," which must be brought under § 523(a)(2)(B). See 11 U.S.C. § 523(a)(2)(A)–(B); see also *In re Howell*, 623 B.R. 565, 576 (Bankr. C.D. Cal. 2020). Under § 523(a)(2)(B), a statement "must either have been written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor." In re *Tallant*, 218 B.R. 58, 69 (B.A.P. 9th Cir. 1998).

> [A] statement is "respecting" a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not. Naturally, then, a statement about a single asset can be a "statement respecting the debtor's financial condition."

*Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 720, 138 S. Ct. 1752, 1761, 201 L. Ed. 2d 102 (2018).

Counsel for Harman argues that Harman's "representations of personal debt and profits to be earned" including that "he expected to earn sufficient profits from the business," have bearing on his overall financial condition and are thus excluded from the Court's consideration under § 523(a)(2)(A).[105] The key fallacy of this theory is that Harman's representations concern his or an insider's future earnings, not past ones. Harman has not cited any legal authority that supports the proposition that statements respecting a debtor's *future* financial condition are excluded from

---

[105] Defendant's Closing Brief, p. 6 [doc. 99].

§ 523(a)(2)(A).  Clearly, the exclusion deals with current financial condition, not the hope that there will be profits in the future.

2.      *Required Elements Under §523(a)(2)(A)*

To prevail on a § 523(a)(2)(A) claim concerning false pretenses or false representation, plaintiffs must prove by a preponderance of the evidence the following five elements:

(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;

(2) knowledge of the falsity or deceptiveness of his statement or conduct;

(3) an intent to deceive;

(4) justifiable reliance by the creditor on the debtor's statement or conduct; and

(5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*In re Weinberg*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (citing *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000)).

(a)      *False Pretenses and False Representations*

A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or conduct intended to create and foster a false impression. *In re Reingold*, 2013 WL 1136546, *3 n.4 (B.A.P. 9th Cir. Mar. 19, 2013); *Shannon v. Russell (In re Russell)*, 203 B.R. 303, 312 (Bankr. S.D. Cal. 1996).

(b)      *Knowledge of Falsity*

A promise can be considered fraudulent when the promisor knew or should have known of his inability to perform. *In re Barrack*, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998). "[A] statement made with reckless indifference to the truth is sufficient to satisfy the requirement of a fraudulent representation by the plaintiff." *Id.* (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir. 1996); and *In re Ettell*, 188 F.3d 1141, 1145 n.4 (B.A.P. 9th Cir. 1999).

### (c)    Intent to Deceive

The promisor must have not only known of the falsity of the representation, but also must intend that the other party would believe it and thus be deceived. *Husky,* 578 U.S. at 360 (citing *Neal v. Clark,* 95 U.S. 704, 709 (1878)).

### (d)    Justifiable Reliance

As to the fourth requirement, "a creditor's reliance on a debtor's misrepresentation need be only justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A)...." *In re Eashai,* 87 F.3d 1082, 1090 (9th Cir. 1996) (citing *Field v. Mans,* 516 U.S. 59, 75, 116 S.Ct. 437, 439, 441, 133 L.Ed.2d 351 (1995)). Justifiable reliance takes into account the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans,* 516 U.S. at 71. Thus, a plaintiff does not have a duty to investigate. *Id.* at 70, 73-75 n.12. However, "justifiable reliance does not exist where a creditor ignores red flags" that show up before extending credit. *In re Miller,* 310 B.R. 185, 198-99 (Bankr. C.D. Cal. 2004) (citing *In re Anastas,* 94 F.3d 1280, 1286 (9th Cir. 1996)); *see also In re Apte,* 180 B.R. 223, 229 (B.A.P. 9th Cir. 1995), *aff'd,* 96 F.3d 1319, 1324 (9th Cir. 1996).

In determining whether a plaintiff's reliance was justifiable, bankruptcy courts "must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor." *In re Kirsh,* 973 F.2d 1454, 1460 (9th Cir. 1992). Krish largely dealt with the issue of a knowledgeable attorney who relied on the representation of his client even when he knew that the client was having financial difficulties. *Id.* at 1455-56. In deciding that the reliance was not justifiable, the Ninth Circuit Court of Appeals stated, "[w]e recognize that [the plaintiff] and [the defendant] were very close friends, but that does not excuse [the plaintiff's] throwing of all caution to the winds and relying on the [defendant's] word alone." *Id.* at 1461.

### (e)    Damages

A creditor's recovery under § 523(a)(2)(A) is the loss to the creditor resulting from the debtor's fraud. *Cohen v. de la Cruz,* 523 U.S. 213, 223, 118 S. Ct. 1212, 140 L. Ed. 2d 341

1   (1998) This may include punitive damages, attorney fees and costs if provided for by contract or

2   nonbankruptcy law. *Id*. Before the exception applies, however, the debtor's fraud must result in a

3   loss to the creditor. *See Field v. Mans*, 516 U.S. at 61, 64 (describing § 523(a)(2)(A) as barring

4   discharge of debts "resulting from" or "traceable to" fraud).

            ***3.      Zhang's $250,000 Contribution to APC Was Not a Triable Issue***

6           At the beginning of this trial, counsel for Zhang argued that the Court should consider a

7   claim under § 523(a)(2)(A) for fraud in the inducement concerning Zhang's initial investment in

8   APC in the amount of $250,000. Counsel for Harman pointed out that neither the Complaint nor

9   the Joint Pretrial Stipulation included this. After oral argument, this Court orally ruled that both

10  the Complaint and the Joint Pretrial Stipulation limited this adversary proceeding to Zhang's

11  investment in the RR film venture in the amount of $210,364; they do not include a claim for

12  relief as to her initial contribution in APC in the amount of $250,000.[106]

13          The Court has wondered why the Complaint did not include the First Operating

14  Agreement and whether this was an error, since new counsel was brought in to represent Zhang

15  in the bankruptcy case. It appears that counsel for Zhang had information that this Court does not

16  have.  They have the transcripts of the trial in the State Court Action and know what the judge

17  decided as to the fraud issue.  They know why the State Court Judgment looks incomplete

18  because it contains no ruling on the $250,000 investment. They know why no motion was

19  brought for additional findings.  And, as careful and ethical attorneys, they must have realized

20  that issue preclusion prohibited a retrial of the same issue between the same parties, particularly

21  because California law and bankruptcy law use the same required findings to grant a judgment

22  for fraud.  The State Court Complaint contains allegations that include all the facts needed to

23  find fraud and they specify the law. Thus, it appears that counsel for Zhang knew that it would be

24  improper to again proceed under § 523(a)(2)(A) as to the First Operating Agreement.

25          Although the State Court Complaint included fraud, it did not include any "willful and

26  malicious injury," which only exists in the Bankruptcy Code. So, had Zhang chosen to do so, she

27

28
    ─────────────────────────
    [106] Trial Transcript for 3/10/25, pp. 8-20 [doc. 95].

                                            -33-

could have proceeded under § 523(a)(6) to seek a judgment for the $250,000 investment under the First Operating Agreement.  But it was left out of the Complaint and the Joint Pretrial Stipulation. And although it is not legally actionable, the Court finds that the First Operating Agreement and the $250,000 invested in APC are relevant to the relationship of the parties and to the later dealings between them. So, the Court will look at the facts to see where they lead.

Starting in 2014, Zhang and Harman had an ongoing relationship in which they built up a basis of both knowledge and trust.  Harman had little excess income or assets.[107]  But he saw two business opportunities, both of which were based on the purchase of "vintage" lenses for filming movies: (1) renting them out to small, independent film-makers for blocks of time; and (2) using them for his own production of a motion picture. He revealed only the first idea to Zhang when he suggested creating APC and having her finance the purchase of the Film Equipment for that entity.

### 4.    *The Film Equipment Rental Venture*

Zhang was aware that Harman had an apparently successful background in film production and direction, and she found this intriguing.  So, when he suggested that they go into the business of renting out vintage lenses, it sounded good to her.  She would be protected by being paid back in full from the rental income and by being a shareholder in APC, which owned the Film Equipment.  The Film Equipment itself could be verified and had intrinsic value.  Her risk was limited.  On the upside, Harman—apparently using his expert knowledge of the film and rental industry—told her about excessive income and appreciation.  He did not tell her of the struggle that Conjunction had in making any profit from the rental of its filmmaking equipment.[108]  Rather, Harman told of a probable $10,000-per-month income and of some $40,000 in initial enhanced equity.  Neither of these statements had a factual basis nor are they even close to reality.  Harman was fully aware of this.

---

[107] Exhibit 248.

[108] It should be noted that there is no evidence of the kinds of equipment that Conjunction owned or the average annual rental income that it brought in except Harman's claim that Conjunction would suffer a loss of approximately $300,000 in 2017 by dedicating equipment and inventory to RR. Ex. 248.  But there is a comment by Harman in the testimony that equipment rental was not a successful part of Conjunction's business. Trial Transcript for 3/11/25, p. 52 [doc. 96].

1    While the income rental figure of $10,000 preceded the formation of APC and Zhang's

2    investment pursuant to the First Operating Agreement, Harman boasted about the $40,000 equity

3    appreciation after Zhang's contribution. Thus, the $40,000 equity boast cannot be the basis of a

4    fraud claim as to the $250,000 invested pursuant to the First Operating Agreement.

5    Had Zhang's claim of fraud in the inducement regarding the First Operating Agreement

6    survived, it is possible that the unfounded claim of income could have been the basis to go

7    forward. But more evidence would have been necessary. Perhaps Harman had some reason to

8    believe this amount was possible. Perhaps the Conjunction equipment was so different that there

9    was no comparison. Perhaps he believed it himself.

10    The fact that Harman used minimal efforts to rent the Film Equipment supports his

11    doubts as to its rental value and his understanding that the Film Equipment would only be of

12    value in creating specialty films — probably independent and for rentals of days or weeks at a

13    time. He did not reveal any of this to Zhang when he enticed her to invest the $250,000 in APC.

14    Again, this could be grounds for a possible finding of fraud in the inducement as to that amount.

15    One other comment on this investment: Harman represented that the film equipment had

16    value that far exceeded the cost. He had no evidence that this was the case, but Zhang also has

17    no evidence that this was not an accurate statement. It would be Zhang's burden to prove the

18    knowing falsity of Harman's representation and then she could seek damages for the difference

19    between her investment (less the costs of storage and insurance) and the actual value of the

20    equipment at the time of purchase. But this is all irrelevant to the adversary proceeding.

21    ### 5.    *The RR Film Venture*

22    Moving to Harman's second purpose: Although there was an attempt by counsel for

23    Zhang to show that Harman already intended to produce RR when he induced Zhang to invest in

24    APC, the facts do not support this. First, APC was formed and Zhang sent the $250,000

25    contribution; only then did the search begin for a vehicle in which the Film Equipment could be

26    used at no cost and thereby keep down the production expenses. There is no evidence of a

27    search prior to Camille contacting Garrett in early March 2017 for a possible script. And it took

28    another six weeks before Harman even read the RR script and began a process to use it.

While Harman did not reveal to Zhang before she signed the First Operating Agreement that he hoped to use the Film Equipment himself (and presumably have her invest in a film production venture), this was still wishful thinking on his part and not a failure to reveal to her before the $250,000 was received.

### 6. Zhang's Transfer of $210,364

So now we move forward to look at the Second Operating Agreement, the Motion Picture Contract, and Zhang's transfer of $210,364. Prior to June 9, 2017, when Zhang initiated the wire transfer, Harman made four representations. The actions show that at the time that Harman made them, none of his representations were false or made without an intent to perform.

First, Harman represented to Zhang that the Motion Picture Contract was provisional and could be changed and clarified after Zhang returned to Switzerland and conferred with her economic and legal advisors. The Motion Picture Contract was provisional; negotiations continued on the terms throughout June 2017, though no meeting of the minds was reached.

Second, Harman represented to Zhang that he would help Zhang obtain an ITIN so that she could do business in the U.S. Harman did take steps to obtain an ITIN for Zhang; he started the multi-week process on June 5, 2017.

Third, Harman represented that he would repay the $25,000 that Zhang loaned to Conjunction to make initial payments to Vancil and Garrett. Harman did repay the $25,000; Camille returned the money to Zhang on July 28, 2017.

Fourth, Harman represented to Zhang that APC would obtain an option to purchase the RR script. On June 7, 2017, Harman executed the Script Option Agreement and paid Garrett pursuant to it.

Without a knowingly false statement, there can be no finding of fraud. Because none of the above statements were false, the claim for relief under § 523(a)(2)(A) fails.

### E. 11 U.S.C. § 523(a)(4)

A bankruptcy discharge does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." 11 U.S.C. § 523(a)(4).

-36-

Federal law determines the issue of whether a fiduciary relationship exists for purposes of § 523(a)(4). However, state law is to be consulted as to whether the trust relationship existed before the wrong occurred and without reference to the wrongful act. Under California law, all partners are trustees over the assets of the partnership and are fiduciaries to each other. Citing to *Leff v. Gunther*, 33 Cal. 3d 508, 514 (1983), the Ninth Circuit Court of Appeals held that "California partners are fiduciaries within the meaning of § 523(a)(4)" and so the debt from one partner to the other is non-dischargeable under §523(a)(4) if the other criteria are met. *Ragsdale v. Haller*, 780 F.2d 794, 796-97 (1986).

The First Operating Agreement created a partnership between Harman and Zhang as to the purchase of the motion picture equipment. Each is a member of APC with a stated ownership interest. The Second Operating Agreement expanded the purpose of the partnership to include the production of motion pictures. It was under this operating agreement that Harman and Zhang went forward with the RR film venture.

Harman was a fiduciary to both Zhang and APC and the complained-of actions had to occur as part of his capacity as a partner. There is no doubt that this was true. The Motion Picture Contract, which was signed by Zhang and by Harman on June 6, 2017, was an agreement made between Jeff Harman as 60% stock holder member of APC TECH LLC and Huan Zhang as 40% stock holder member of APC TECH LLC. They agreed as Stockholder Members to acquire all title and interest in RR and to produce it. Zhang's money was designated as a Capital Contribution to APC and would be repaid from the net profits received by APC from the RR production. They each signed as individuals with Zhang identified as the "Executive Producer" and Harman as the "Director/Producer."[109]

Zhang does not dispute the terms of the Motion Picture Contract except that she insists that she believed that it was provisional. Harman does not argue that it was a complete agreement and during the following weeks they worked on negotiating some additional terms – specifically how they would divide any losses that were to occur. Even though Zhang knew that

---

[109] Exhibit 33.

1   the Motion Picture Contract was provisional, she was willing to send the first installment when

2   Harman asked for it.  Harman did not misrepresent that the money was needed and what it was to

3   be used for.  And, in general, it was used for the stated purpose in line with the initial budget.

4          Although Harman used his position as Zhang's astrologer to urge her to immediately sign

5   the Motion Picture Contract without time to review it with her financial and legal advisers, the

6   rest of their relationship from that point forward was limited to the business of producing RR.

7   All of Harman's activities relevant to this adversary proceeding were due to his functioning as a

8   partner and, specifically, as the partner who was in charge of the business aspects of the

9   partnership.

10                  ***1.    Fraud or Defalcation***

11         Thus, we come once again to the requirement that fraud occurred.  As noted above, the

12  elements of fraud are the same under §§ 523(a)(2) and (a)(4).   There is no finding of fraud in the

13  § 523(a)(2)(A) analysis, but the lesser standard of defalcation can apply to §523(a)(4).   Courts

14  had struggled with trying to define "defalcation" until the Supreme Court stepped in:

15              [W]here the conduct at issue does not involve bad faith, moral turpitude, or other
16              immoral conduct, the term requires an intentional wrong. We include as
                intentional not only conduct that the fiduciary knows is improper but also reckless
17              conduct of the kind that the criminal law often treats as the equivalent. Thus, we
                include reckless conduct of the kind set forth in the Model Penal Code. Where
18              actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if
19              the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and
                unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI,
20              Model Penal Code § 2.02(2)(c), p. 226 (1985). *See id.*, § 2.02 Comment 9, at 248
                (explaining that the Model Penal Code's definition of "knowledge" was designed
21              to include " 'wilful blindness' "). That risk "must be of such a nature and degree
22              that, considering the nature and purpose of the actor's conduct and the
                circumstances known to him, its disregard involves a gross deviation from the
23              standard of conduct that a law-abiding person would observe in the actor's
24              situation." *Id.*, § 2.02(2)(c), at 226 (emphasis added). *Cf. Ernst & Ernst v.
                Hochfelder*, 425 U.S. 185, 194, n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)
25              (defining scienter for securities law purposes as "a mental state embracing intent
                to deceive, manipulate, or defraud").
26

27  *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013).

28

As noted, the initial $250,000 investment in APC is not actionable in this trial.  As to the $210,364 transfer to produce RR, urging Zhang to invest was not improper.  At that time it appeared possible (but perhaps not likely) that RR could be produced for somewhere around the $600,000+ figure and if it exceeded that amount it would not be by so much that Zhang or some other investor could not or would not make up the difference.  Even using the money to prematurely buy the script (which happened a few days before Zhang demanded a refund of the $210,364) or to pay Vancil after Zhang instructed Harman not to do so does not arise to defalcation.  During 2017, Harman did not know that the film could not go forward even if Zhang withdrew.  Purchasing the script at a time when there was still almost a year left under the option was unnecessary and not a wise use of the money.  But defalcation requires more than some bad management.  Paying Vancil and other costs were necessary to protect Zhang's initial investment and move forward with creating the film.

During 2017, Harman paid himself a director's salary totaling $69,666.70 ($23,666.70 on July13 and $46,000 on December 11).[110]  While Zhang was not aware of these specific payments and did not actually approve them, on June 8 she had written that she expected Harman to receive some amount for his work, but only after the film makes a profit.[111]  And on July 14, 2017 she commented that the budget called for a total director's fee of $71,000, but she did not agree or object at that time.[112]

There is no evidence of communication between Zhang and Harman after September 1, 2017. But by December 2017 it was perfectly clear that Zhang had pulled out and would send no other money. Harman had not located other investors.  Harman did not know if or when that would happen. During the three months since communication terminated, not a single penny had been invested.  In fact, other than $13,000 in deposits [and the Court does not know what these are] no money was ever invested except the $210,364 that Zhang contributed.[113]

---

[110] Exhibit 61; Exhibit 260, acct. 9991054108; Exhibit 260, acct. 354386459.
[111] Exhibit 245.
[112] Exhibit 250.
[113] Exhibit 61.

1    The only way that Harman could recover the money already spent and possibly fulfill the

2    purpose of the partnership was to complete the film.  He had to pay Vancil under the terms of his

3    contract.  Although Harman had spent months working on the film, he did not have Zhang's

4    permission to pay himself in December. There is no evidence that this $46,000 payment in

5    December was required for him to continue to work on producing RR.  He had his astrology

6    business and may have put time in on other money-making enterprises.  There is no showing that

7    he worked exclusively on RR for months at a time.  There is no evidence that it was necessary to

8    the production of RR for him to divert this money to himself, even as salary, and thus deplete the

9    cash assets of APC.  And certainly not to do so without the consent of Zhang.

10    Harman's actions were even more glaring in 2018.  In July 2018 Harman paid himself

11    $7,000 as producer of RR and in August he paid himself another $17,000 as producer.[114]  This

12    was months after Vancil had sent him a revised budget that the movie was estimated to cost over

13    $2.4 million, some four times as much as originally expected.[115]  Harman knew that Zhang was

14    not going to send more than the initial $210,364 and even if Harman sued her for the balance due

15    under the Movie Picture Contract, her total investment would be only one-quarter of the

16    necessary funds.  Once it became clear that Harman had not been able to find other investors,

17    that Zhang was not going to send more than the $210,364, that the costs had quadrupled, and that

18    he did not have Zhang's permission to pay himself more than the initial projection of $71,000 for

19    the whole movie (which she had never actually agreed to), he breached his fiduciary duty to her

20    and knew it was improper and reckless to pay himself $24,000 in 2018.  And his August

21    payments were after Zhang's lawsuit had been filed and this meant that production would end.

22    Harman consciously disregarded a substantial and unjustifiable risk that this payment would

23    violate his fiduciary duty.

24            **2.    *Embezzlement***

25    Embezzlement and larceny are separate grounds for a § 523(a)(4) action. They do not

26    require a fiduciary relationship. The major difference between the two is that embezzlement

27    _____

28    [114] Exhibit 61.
     [115] Revised Budget received on February 13, 2018.  Exhibit 53; 263.

applies when the person has lawfully come by the money; larceny applies when the money was taken without the consent of the owner. Only embezzlement could apply in this case.

> Federal law and not state law controls the definition of embezzlement for purposes of section 523(a)(4). *Fraternal Order of Eagles, Aerie v. Mercer (In re Mercer)*, 169 B.R. 694, 697 (Bankr.W.D.Wash.1994); *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *In re Schultz*, 46 B.R. 880, 890 (Bankr.D.Nev.1985). Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895).
>
> In the context of non-dischargeability, embezzlement requires three elements: (1) property rightfully in the possession of a nonowner, (2) nonowner's appropriation of the property to a use other than which it was entrusted, and (3) circumstances indicating fraud. *Transamerica Commercial Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir.1991) (quoting *In re Hoffman*, 70 B.R. 155, 162 (Bankr.W.D.Ark.1986)); *In re Schultz*, 46 B.R. at 889.

*In re Wada*, 210 B.R. 572, 576 (BAP 9th Cir. 1997).

This could be embezzlement, but there needs to be actual fraud to support such a finding. Harman misappropriated some of Zhang's investment but he made no representations to her and that is a necessary element.

The Court finds that Harman committed defalcation as to the amount of the $70,000 that he paid himself in December 2017 and in 2018.  As to the payment of $46,000 for full ownership of the RR script, while this was reckless and premature, it does not rise to defalcation.  At the time he did not see a substantial and unjustifiable risk that violated his fiduciary duty.  APC and thus Zhang own a piece of intellectual property that Harman believed had substantial value.  He knew that he would have had to make the full payment by a date certain and there is no evidence that at this point he had reasonable doubts that the film would complete production.

### F.    11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that a discharge under § 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The "willful" and "malicious" requirements are conjunctive and subject to separate analysis. *In re Sicroff*, 401 F.3d 1101, 1105 (9th Cir. 2005). The

plaintiff's burden of proof in a nondischargeability action under 11 U.S.C. § 523(a) is "the

ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

### Willfulness

A "willful" injury is a "deliberate or intentional *injury*, not merely a deliberate or

intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140

L.Ed.2d 90 (1998) (emphasis in original). Debts "arising from recklessly or negligently inflicted

injuries do not fall within the compass of § 523(a)(6)." *Id*. at 64. It suffices, however, if the

debtor knew that harm to the creditor was "substantially certain." *In re Su*, 290 F.3d 1140, 1145-

46 (9th Cir. 2002); *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001) ("[T]he willful injury

requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive

to inflict the injury or that the debtor believed that injury was substantially certain to occur as a

result of his conduct.") (emphasis in original).

### Maliciousness

"[T]he 'malicious' injury requirement of § 523(a)(6) is separate from the 'willful'

requirement." *Su*, 290 F.3d at 1146. Maliciousness requires (1) a wrongful act; (2) done

intentionally; (3) which necessarily causes injury; (4) without just cause or excuse. *Id*. at 1147.

"[T]he 'done intentionally' element of a 'malicious' injury brings into play the same subjective

standard of intent which focuses on the [tortfeasor]'s knowledge of harm to the creditor." *In re

Thiara*, 285 B.R. 420, 434 (B.A.P. 9th Cir. 2002); *see also Jercich*, 238 F.3d at 1209. This

definition "does *not* require a showing of biblical malice, i.e., personal hatred, spite, or ill-will."

*In re Bammer*, 131 F.3d 788, 791 (9th Cir. 1997) (emphasis in original).

There are various points in time where actions by Harman need to be examined under the

provisions of § 523(a)(6).  Specifically, these are as follows:

1.  Inducing Zhang to invest in APC for the film equipment rental venture;

2.  Inducing Zhang to sign the First Operating Agreement and transfer the $250,000
    before she could consult with her financial and legal advisors;

3.  Inducing Zhang to invest in the RR film venture through the creation of the Second Operating Agreement and the signing of the Motion Picture Contract and without giving her time to consult with her advisors and lawyers;

4.  Inducing Zhang to transfer the $210,364 before there was an agreement as to the final terms of the Second Operating Agreement and the Motion Picture Contract;

5.  Using all or part of the $210,364 that Zhang transferred to APC on June 9, 2017, even after she instructed Harman not to use the money for further steps to produce RR until they had an agreement; continuing to use all or part of the $210,364 after it was clear that Zhang had withdrawn or was highly likely to withdraw from financing the RR film venture; and

6.  Paying himself without Zhang's consent and/or at a time which damaged APC.

### 1.    *Inducing Zhang to Invest in APC for the Film Equipment Rental Venture*

The Court is well aware that no damages can arise as to the $250,000 investment in the Film Equipment Rental Venture. But, as noted above, this is closely linked to Zhang's later investment and so it is worthwhile analyzing it.

As discussed above, Harman misled Zhang before she entered into the First Operating Agreement and sent the $250,000 pursuant to that. He told her that she could expect rental income of $10,000 per month and there is no evidence that this was even possible. His statements concerning the $40,000+ immediate appreciation came after the investment and are not part of the inducement of Zhang to invest.

The evidence and later actions demonstrate that Harman wanted the equipment, at least in part, so that he could contain the costs when he would be able to make an independent film. Was his lack of disclosure willful and malicious?

As to "willfulness," Zhang did not show that Harman's subjective motive in not disclosing his intent to later use the APC equipment to make an independent film was to inflict injury on her. Harman was in the equipment rental business through Conjunction and he began marketing efforts (perhaps for both entities) shortly after he had purchased the full inventory of

1    APC equipment.[116]  This was some weeks before he had even read the RR script, although he

2    was aware that Camille was seeking a proper vehicle to produce. Even if the film equipment

3    rental venture was successful, Harman had no basis to believe that the $10,000 per month

4    income figure was achievable.  But Harman had every hope that, if he could find the right

5    vehicle, both he and Zhang had a good chance to make a substantial amount of money.  And

6    although he had to know that the odds of profit from an independent movie are not that good, his

7    subjective intent was not to injure Zhang.

8         Zhang also did not show that Harman believed that injury was substantially certain to

9    occur as a result of his conduct. The equipment did exist as described. There is no evidence that

10   it was worth less than Harman paid for it.  And there is no evidence that Zhang will suffer a loss

11   when the equipment is finally sold. To the contrary, both the First Operating Agreement and the

12   Second Operating Agreement provide that (a) Zhang will be repaid for her full investment from

13   any profits before Harman receives anything, and (b) the equipment is the collateral for her

14   repayment of the $250,000. So, Zhang suffered no injury from her investment under the First

15   Operating Agreement except, perhaps, her dashed hopes of a quick repayment and a steady

16   stream of income.  However, the Court's review of the correspondence does not evidence that

17   she even hoped for quick repayment and ongoing income.

18        As to "maliciousness," Harman did intentionally do the wrongful act of misleading

19   Zhang as to the possible rental income from the equipment and his intent to use this equipment

20   for his own purposes.  Why he did this is not clear.  He may have hoped to implement his

21   nascent plan to use it himself for an independent film.  But at the time, he had no script, no

22   certainty that he would find one, and no certainty that Zhang would invest in it.  Maybe he would

23   never find an investor.  In February 2017, he had no certainty, just a hope.  In the meantime, the

24   equipment was rentable (under certain circumstances) and would be available to him for all

25   future movie productions that he might undertake.

26

27

28

[116] Exhibit 261.

In her later correspondence with him, Zhang never mentioned Harman's claim regarding $10,000-per-month income. She was excited about being part of the movie-making industry. She looked to the existence and value of the lenses and related equipment as the primary safeguard of her investment.  And seeing it in use was a great satisfaction.

The falsehood of the initial claim of monthly income was not seen by her as an expectation or an injury.  But even if that did cause injury, it is insufficient under § 523(a)(6) because there is no evidence that the injury was willful and malicious. So, the omissions from the Complaint and/or the Joint Pretrial Stipulation to seek recovery of the $250,000 as to the First Operating Agreement have no effect on the outcome of this trial; Zhang would not be able to recover any damages for that investment.

2. ***Inducing Zhang to Sign the First Operating Agreement and Transfer the $250,000 Before She Could Consult with Her Financial and Legal Advisors***

A separate assertion as to the First Operating Agreement deals with the rush to sign and to send money. Both parties knew that the First Operating Agreement was to buy lenses and other filming equipment and that is exactly what the money was used for.  Zhang received photos and inventories of what was purchased and later saw it in person and in use.

There is no indication that Zhang ever consulted with her advisors or, if she did, that she wished for changes to be made to the First Operating Agreement.  The changes made to the Second Operating Agreement do not reflect any concerns that Zhang might have had as to the establishment of APC or the purchase of the equipment.

The fact that Harman rushed Zhang to sign the First Operating Agreement and to immediately send the $250,000 is not actionable under § 523(a)(6).  Once again, it made no difference that it was not included in the Complaint and/or the Joint Pretrial Stipulation.

3.    *Inducing Zhang to Invest in the RR Film Venture Through the Creation of the Second Operating Agreement and the Signing of the Motion Picture Contract and Without Giving Her Time to Consult with Her Advisors and Lawyers*

Although Harman later wrote Zhang that if she did not invest the balance of the $631,092 it would be a breach of contract, it is clear that both he and Zhang were aware that the Motion Picture Contract and the Second Operating Agreement were only preliminary agreements; they were subject to clarification and revision after Zhang had a chance to consult with her economic and legal advisors. At the time of the signatures, no money had changed hands. And although there was a stated deadline for Zhang to pay the full $631,092, that was forty-five days in the future and there was no reason to believe that the deadline could not be changed through further negotiation.

The evidence shows that the parties agreed that Zhang's advisors might suggest or require changes. And they did. At least one attorney said that APC could not be used to handle the RR film venture; a new company had to be set up. Harman did not dispute this. Although Harman did not agree with the suggestion that Zhang make a loan instead of an investment, he was amenable to trying to arrive at terms to handle a future loss as to the RR film venture and even drafted the Motion Picture Contract Addendum, which Zhang did not accept.

Therefore, there was no injury on Harman's part. No damages existed from the execution of these two documents and nothing that was done was willful or malicious.

4.    *Inducing Zhang to Transfer the $210,364 Before There Was an Agreement as to the Terms of the Second Operating Agreement and the Motion Picture Contract*

Everything was a rush. Zhang complained about this, but she complied. She trusted Harman and believed in his astrological urgings. To some extent, this was cultural on her part. Given the testimony of Harman as to his own lack of belief in astrology, it may be easy to conclude that he was acting to defraud Zhang when he said that it was an auspicious time to send the money, which he did as to the $250,000. But as to the $210,364, there is no evidence that he

used astrology to choose the date.  Harman simply needed the money to move forward with the project and he disclosed this to Zhang.  Harman needed to tie up the script without delay because Garrett had told him that there was another party who was interested in it.  Harman's rush was to obtain the script option as well as pay Vancil to keep him on board.  Harman (through Camille) even borrowed $25,000 from Zhang to do so.  But this had to be returned to her and it was returned. There is no showing that he had the money to make these initial payments.

Obtaining Zhang's first installment of $210,364 without delay was important to both Harman and to Zhang in order to move forward with the RR film venture.  Zhang certainly could have said no.  While she complained, she complied.

Zhang did not establish that Harman had the subjective motive to inflict injury or that Harman believed that injury was substantially certain to occur by rushing her to transfer the $210,634 before there was a final agreement as to the terms of the Second Operating Agreement and the Motion Picture Contract.  There was no injury at this point in time.  His rush was not willful and malicious.

> **5.    *Using All or Part of the $210,364 That Zhang Transferred to APC on June 9, 2017, Even After She Instructed Harman Not to Use the Money for Further Steps to Produce RR Until They Had an Agreement; Continuing to Use All or Part of the $210,364 After It Was Clear That Zhang Had Withdrawn or Was Highly Likely to Withdraw from Financing the RR Film Venture***

When Zhang wired the $210,362, she immediately followed it up with an email on June 11, 2017, in which she instructed Harman not to use this money to take further steps in producing RR until a risk agreement would be reached:

> I wired the USD 210,364.00 to be available for you per your request but I require to hold back from using the fund to make any further steps under RR production until we have the chance to clarify on the risk taking commitment between us in the case of the RR production comes into a loss.  For example a 100% risk on my shoulder to lose USD 631092.00 is a not what I would go for. Such an amount is critical for me in shaping up my wealth planning.  I cannot afford the full risk to

lose them on one go. Thus it is critical for both of us to have a look of where we
are capable to stand in worst scenario to know if we can go ahead or not.[117]

When Zhang had sent the money, she knew that some of it would be used to pay Vancil
and some would be for the option of the RR script from Garrett. She was willing for Harman to
have the balance available as needed, but only after the Motion Picture Contract (which was
provisional) was modified to include an agreement as to risk-sharing of any loss.  This was clear
from her emails.

A final agreement was never acceptable to the parties; during the negotiation period,
Harman continued to move forward with the production.  Some of the expenses were required in
order to protect the investment up to this time. Some weren't and Harman knew that this was the
case.  But there is no evidence that he expected the RR film venture to lose money or never to be
produced.  He undertook no serious backup plan to find investor money in case Zhang refused to
go forward, although in August 2017 he told Vancil that he would be approaching the bank for a
loan.[118]  He spent some money that he did not need to, such as paying Garrett for the purchase of
the script.  He paid himself a salary.

Although Zhang asked that the money not be used, she sent it when asked and had to
wonder about the rush if it was only going to sit in the APC bank account.  She knew that some
of it was needed to pay Vancil and to buy the option for the RR script.  As to these items, there is
no wrongdoing on Harman's part and no injury to Zhang who sent the money with her eyes wide
open.  She also was concerned about salaries and major expenditures that could not be recovered
if the film was not completed.  As shown by her later emails, she was not worried about the
minor expenditures that were needed to keep the project viable. She did not want to destroy it.
She just wanted to halt production until a final agreement was reached.

Harman had faith that the RR film venture would be a success.  Not only would Camille
and Aidan earn salaries, but they would be exposed to the movie-making world.  He could take a

---

[117] Exhibit 249.
[118] Exhibit 256.

1  salary and could continue to do so as well as earn a profit from the film. He appears to have been

2  dedicated to the project and to have carried out the functions of a director and producer.

3       During June and July, Zhang continued to express her concerns about the viability of the

4  RR film venture and the possibility of loss.  She made it clear that she was unlikely to invest

5  more than the initial $210,364 unless she had confidence that her potential loss would not exceed

6  that amount.  Also that she expected to be reimbursed for at least a substantial part of the

7  $210,364 if no agreement to share the loss was reached.  To that end, she did not consent to

8  spending more than was absolutely necessary to keep the project viable, but not to move it

9  forward.

10      Harman had to know that Zhang was highly unlikely to invest the $400,000+ balance due

11 under the Motion Picture Contract.  She never suggested that she would.  She was concerned

12 about obtaining a refund of her $210,364 and about Harman's plans to obtain other investors to

13 make the film a reality.  There is no showing that Harman undertook a serious search for other

14 investors at this time, just as there is no evidence that Harman undertook a meaningful campaign

15 to rent out the Film Equipment during 2017 and 2018.

16      By mid-July 2017, Zhang was demanding the refund of her $210,346 investment. But for

17 the next six weeks, Harman continued to interact with Zhang in hopes of keeping her in the

18 project.  In the meanwhile, on August 2, Harman may have changed the production company

19 from APC and sought out a banker, presumably looking for replacement financing for the RR

20 film venture.[119]  Although Zhang had asked that APC and RR be separated (August 31, 2017),

21 there is no evidence that Harman did separate them or that he notified Zhang of any attempt to do

22 so.

23      Reviewing the accounting, the only major outlays from June through the rest of 2017

24 were $3,000 per month for Vancil, $69,666.74 as director's salary for Harman, $7,000 to Garrett

25 for the script option, and an additional $46,000 to Garrett to purchase the script.  Except for the

26 purchase payment to Garrett and the salary to Harman, the Court finds that the other payments

27

28
_____
[119] Exhibit 256.

(including the ones to Vancil and the minor ones for food, mileage, etc.) were not done willfully or maliciously. The payment to Vancil was needed to keep the RR film venture viable and the minor ones are not really encompassed in Zhang's instruction email of June 11 or her later emails as to salaries and contracts. But the payment to Garrett to purchase the script was not warranted and there was no agreement that Harman would receive any salary at this time.

A review of the accounting shows that the major unauthorized and unnecessary expenditure was to purchase the script from Garrett. Zhang's money was used to pay for the option, but the option was to last until June 2018. There was no justification to pay Garrett the $46,000 purchase price on July 16, 2017, which was some eleven months early. And Harman had told Zhang that he would not make this payment until they had agreed to move forward. [120]

And while APC became the owner of the RR script, which potentially has some value, the script has not been sold or appraised so there is no way to know what recovery can be obtained. Also, the premature payment to Garrett depleted the cash available to move forward and no substantial efforts were undertaken by Harman to find other investors to make up that difference.

While there is no justification for premature payment to Garrett, there is no showing that this was done in order to inflict injury on Zhang or in the belief that injury would occur. The script became an asset of APC and there is no evidence that it was bought for more than the fair market price. Buying it prematurely may not have been a wise business action, but there is no evidence that it was malicious as to Zhang in that it did not necessarily cause injury. Nor was it willful because there is no showing that Harman had a subjective motive to injure Zhang or that it was substantially certain that injury would occur. So, the premature payment to Garrett was not a violation under § 523(a)(6).

---

[120] Exhibit 248.

### 6. *Paying Himself Without Zhang's Consent and/or at a Time Which Damaged APC*

The other improper act was Harman paying himself as director/producer without the permission of Zhang and in violation of her emails not to pay money that could not be recovered later. Harman paid himself $23,666.70 (some may have been expense reimbursement) in July 2017 and an additional $46,000 in December 2017.  As early as June 14, 2017, Zhang was aware that the RR budget included $71,000 for payment to Harman as director and she did not agree or object. The $71,000 figure was for the entire production of RR, not just for pe-production work. Zhang had indicated in her June 8, 2018 email that there was no agreement of when or how much Harman would be paid and that likely this would be after the film was produced and marketed.  But because Zhang was aware of the $71,000 figure in the budget, it was not unreasonable for Harman to take an initial $23,666.70 in July 2017 while Harman and Zhang were still negotiating the final terms of her investment.

Zhang's August 31, 2017, email is absolutely clear that she did not intend to go forward and that her money was not to be used to finance the RR film venture.  She sought a settlement and attorneys' fees. [121]   The record does not include any communications between Harman and Zhang after September 1, 2017.  Perhaps they were at the attorney level; perhaps they were not put in evidence, perhaps they did not occur at all. The Court must assume that no substantive discussions or negotiations took place after September 1, 2017.  From that point forward there was no justification for Harman to pay himself a salary.

Nonetheless in December 2017, without notice to or permission of Zhang, Harman paid himself $46,000.  Unlike the money paid to Vancil, which was under a written contract and was necessary to keep the project going, Harman took this $46,000 from Zhang willfully and maliciously.  He knew that no other investors were on the horizon.  He knew that profits were not certain even if he found the money to complete the film.  He knew that under the current budget paying himself almost the full $71,000 at that point in time was not warranted.  And at

---

[121] Exhibit 251

that point in time, injury to Zhang was substantially certain to occur unless he could find new investors, which was very uncertain. It was wrongful for him to take this money at that time. Harman acted intentionally and necessarily caused harm to Zhang. This is actionable under § 523(a)(6) in the amount of $46,000.

During 2018 some production occurred. Vancil continued to be paid $3,000 per month. Paying Vancil was based on his contract and kept the production alive. There was no intent or belief that Zhang would suffer an injury because of this. Although Zhang said that she did not read the Line Producer Agreement when she witnessed it, she certainly had access to it and had to know that Vancil would be paid on a monthly basis or much of his prior work would probably be valueless. So, the continued payments to Vancil are not violative of § 523(a)(6).

Work on RR continued in 2018, but no further investment was received. On February 13, 2018, Vancil sent Harman an email that the budget for RR would exceed $2.4 million. Harman never passed this on to Zhang and there is no evidence that he took meaningful steps to raise the additional money. There were no major actors under contract and no serious attempt had been made to hire the "named stars" who were anticipated to be part of this and might be a draw to potential investors. This picture was not going forward even if Zhang was willing to complete the Motion Picture Deal investment. And there was no chance that she had the means or interest to finance the additional $1.8 million that would be needed.

On June 28, 2018, Harman, as executive producer, entered into a revised line producer agreement with Vancil, signing it individually as executive producer and not on behalf of APC. Thus, APC owned the RR script but had no other assets as to the RR Film.[122]

On July 20, 2018, Harman paid himself $7,000 as producer of RR. In August 2018, he made three more payments to himself as producer totaling $17,000 (8/20 - $7,000; 8/27 - $7,000; 8/29 - $3,000).[123] All three of the August payments were after August 14, 2018, which was the date that Zhang filed her lawsuit. Together they stripped the APC account of all but $1,042.80

---

[122] Exhibit 54; 268.
[123] Ex. 61. Ex. 273, account #3543865459.

for the film venture, although $6,111.59 remained for the rental venture..[124]   These were

particularly egregious.  As Harman testified, once the lawsuit was filed, the investors were no

longer there: "Would you want to invest into a film – I completely stopped it, as I testified in my

declaration.  I mean, everybody scrambled for the woods. I mean, we're going to invest a film

during a lawsuit?"[125]  Further, as to the July 2018 payment, Harman knew that the budget

projection was $2.4 million.  He had not even been able to raise the missing $400,000+ from the

Motion Picture Deal contract.  There was no evidence that the RR film venture was feasible and

there was no justification for Harman to remove $24,000 from APC at that time – even for back

salary.  In fact, there is no evidence of an employment agreement or contract as to how much he

was to be paid and when.

The language of both the First Operating Agreement and the Second Operating

Agreement as to repayment of Zhang's initial investments is confusing:

From the First Operating Agreement ¶2.2: "Net profits derived after reasonable company

operating expenses shall be utilized to pay off the initial investment back to Huan Zhang in

annual quarterly payments in the interest set forth above in **2.1 Initial Members"** [bold in

original]

From the Second Operating Agreement ¶2.2: "Net profits derived after reasonable

company operating expenses shall be utilized to pay off the initial investment back to Huan

Zhang in annual quarterly payments in the interest set forth above."

The reference to "2.1 Initial Members" and "set forth above" reflects that Harman has a

60% ownership interest and Zhang has a 40% ownership interest. What does "annual quarterly

payments" mean? Is this four payments per year or one payment per year? These terms are

mutually exclusive.  And since it refers to Zhang's interest (40%), does this mean that 40% of

the net profits are to be distributed to Zhang and the rest held back for Harman once Zhang has

been reimbursed for her investment?  Or does it mean that 40% is paid to Zhang and later the

balance of the net profits are split between Harman and Zhang in a 60/40 ratio?

---

[124] Exhibit 61.
[125] Trial Transcript for 3/11/25, p. 83 [doc. 96].

The Motion Picture Contract modifies the repayment as to Zhang's investment in APC when it comes to RR. It calls for a "Capital Contribution" of $631,092 to be paid by Zhang in three installments within 45 days. It goes on to state:

> It is agreed that Huan Zhang shall be repaid the Capital Contribution 639,092.00 USD by any and all net profits received by APC Tech LLC, from The Production [RR], after any reasonable company operating expenses, upon any first funds derived by The Production, in any distribution or marketing contracts throughout the world. All profits after the repayment of the Capital Contribution in the amount of 631,092.00USD to Huan Zhang related to The Production shall be distributed to the Stock holder members of APC Tech LLC, respectively, Huan Zhang 40% and Jeff Harman 60%.[126]

This provision applied only if RR was produced and made a profit and it Zhang invested the full $639,092. Neither of these events occurred. Nonetheless, Zhang had a claim to at least 40% of the remaining money in APC as well as 40% of any other assets of APC.

While there is no evidence that Harman intended to inflict injury on Zhang, that can be inferred because it would remove money from APC that belonged to Zhang. Harman had to believe that it was substantially certain that his transfer of this money to himself would injure Zhang both by taking her money and by leaving too little cash to go forward. Therefore, the acts were willful.

Further, they were wrongful and without consent of Zhang or the existence of a contract, were done intentionally, and necessarily caused Zhang harm by removing assets from APC. Therefore, Harman's payments to himself were malicious.

Harman is liable under §523(a)(6) in the amount of $70,000.

### G.    *Prejudgment Interest and Attorney's Fees*

In addition to recovery of the $210,364, Zhang seeks prejudgment interest as calculated in the State Court Judgment and attorney's fees and costs that Zhang paid to her counsel in the State Court Action. The State Court Judgment does not specify its basis for awarding prejudgment interest and it refused to award attorney fees. As to the request for attorney fees, it

---

[126] Ex. 33.

1    refers to "various tort theories."[127] These may, or may not, be the same as exist in 11 U.S.C.

2    §523(a).

3        "[T]he award of prejudgment interest in a case under federal law is a matter left to the

4    sound discretion of the trial court. Awards of prejudgment interest are governed by

5    considerations of fairness and are awarded when it is necessary to make the wronged party

6    whole." *In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994) (quoting *Purcell v. United States*, 1

7    F.3d 932, 942-43 (9th Cir. 1993)).

8        The State Court Judgment uses the California rate of 10% per annum for interest and

9    calculates this from the date that Zhang sent the $210,364 until the date of the State Court

10   Judgment (4 years and 9 months).  In this adversary proceeding, were the Court to award

11   prejudgment interest, it would not begin until December 2017 and would be at the federal

12   interest rate, which is much lower. In the discretion of this Court, the prejudgment interest that is

13   included in the State Court Judgment is dischargeable and will not be included in the judgment in

14   this adversary proceeding.

15       In an exception to discharge action under 11 U.S.C. § 523, an award of attorney's fees

16   must have a basis in statute or contract, and the conduct giving rise to attorney's fees must be

17   independently sufficient to support an exception to discharge. *See In re Sabban*, 600 F.3d 1219,

18   1223-24 (9th Cir. 2010). Zhang cites article 11.4 of the Second Operating Agreement for the

19   proposition that attorney's fees are recoverable. That would apply to breach of contract. The

20   State Court did not grant the request for attorney fees under that theory, but held that the State

21   Court Judgment was based on various tort claims. These tort claims may or may not be specific

22   to this adversary proceeding, which is under §523(a).

23       The Court declines to award Zhang attorney fees for prosecuting the State Court

24   Complaint.

25   **III.    CONCLUSION**

26       In summary, the facts in this case can be seen as two islands connected by a bridge.  The

27

28

---

[127] Exhibit 57.

first island is the creation of APC and Zhang's $250,000 investment in that company.  That

island intended to and was populated by classic movie-making lenses and various related

equipment. When the island was created, its foundation was not 100% solid.  It rested on a

representation by Harman that its assets would bring in a high amount of income and that they

would greatly appreciate.  The basis of the appreciation claim is questionable, though there is

Harman's sworn statement that the assets were worth more than was paid for them.  But there is

no evidence supporting this.  The representation of income was vastly overstated.  Harman knew

from his dealings with Conjunction, which also had movie making equipment and was not

finding a lucrative rental market for it, that there was no certainty that the Film Equipment would

create the kind of income that he had told Zhang about. As noted, the Film Equipment was

purchased and exists today.

Across a strait of water is the other island.  This one is occupied by a movie production

company that was set to move forward with filming a vehicle called "Riley's Rainbow."  On this

island is a writer (Gunnar Garrett), several cast members (Camille and Aiden), sets, a line

producer (Joshua Vancil), and the possibility of one or more well-known actors.  The director

(Harman) moves back and forth across the bridge, as needed.

The bridge consists of a dream that solidifies as it extends from the first island to the

second.  At the beginning, when the first island was established, the second was only a hope.  A

hope to produce a movie.  A hope to use the Film Equipment that was resident on the first island

to film that movie and thus keep costs down.  There was no script, no staff, nothing but a hope.

But the hope and plan were there from the beginning, though not revealed to Zhang, whose

investment made the first island possible and the second island somewhat feasible.

Once it was certain that there would be movie-making equipment on the first island,

Jeffrey Harman, who was the ruler of both islands and of the bridge, began searching for the

script that would extend the bridge to the second island that he planned to build.  It took several

months, but he found "Riley's Rainbow."  That script filled every open space in the bridge so

that it could reach the second island.  It had a good professional writer who was willing to sell it,

roles for Harman's wife and his teenage son, and could be produced on a relatively small budget.

1   So, he located a professional line producer who would not charge a fortune, planned to line up

2   known talent, and only needed investor money to move forward.

3           And that is when he finally walked Zhang across the bridge.

4           Once Harman had settled on "Riley's Rainbow," he identified Zhang as the initial and

5   (hopefully) sole investor. He was so certain of her that he did not seek other investors.  He was

6   so certain of the initial budget that he did not plan for it to be quadrupled. This hope was without

7   foundation and he had to have known this.  Unfortunately for Harman, Zhang wanted off the

8   second island.

9           Following entry of the judgment in this case, the parties are unhappily stuck on the

10  second island together. Harman presumably still wants to produce the RR film, although Aidan is

11  no longer a teenager. APC still exists, although Article 7 of the Second Operating Agreement

12  provides for its dissolution as a result of Harman's bankruptcy. Even if dissolved, APC still owns

13  the Film Equipment and the RR script. Zhang still wants off the island, and now will hold a

14  $70,000 judgment against Harman. However, Zhang is preventing the sale of the Film

15  Equipment and, perhaps, of the RR script (although it has been rewritten various times).

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

So, the parties can maintain their unhappy status quo and remain on the second island indefinitely. But the Court envisions another outcome in which the parties leave the second island by liquidating the assets of APC pursuant to Article 8 of the Second Operating Agreement (that is, selling the Film Equipment and selling or abandoning the RR script). The proceeds from such liquidation might satisfy Zhang's judgment against Harman, and the parties can go their separate ways. Although Zhang and Harman will not have seen the RR film venture through to distribution, they have the opportunity to write an ending to the interpersonal and legal saga borne by that venture. The Court urges the parties to appeal to their better judgment in this regard, but that is up to the parties to decide.

# # #

Date: July 3, 2025

Geraldine Mund
United States Bankruptcy Judge